# Appendix Exhibit A-1

**In the Matter Of:**

COLIN SKARIA vs FORTITUDE SYSTEMS

3:20-cv-01203-D

---

**COLIN SKARIA**

*March 11, 2021*

---



800.211.DEPO (3376)
EsquireSolutions.com

Appx. 2

1                IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF TEXAS
2                        DALLAS DIVISION

3    COLIN SKARIA,            )
                              )
4              Plaintiff, )  Civil Action No.:
                              )  3:20-cv-01203-D
5    VS                       )
                              )
6    FORTITUDE SYSTEMS        )
     INTERNATIONAL, LLC AND   )
7    ABBOTT LABORATORIES, INC., )
                              )
8              Defendant. )

9    _____

10             VIDEOTAPED ORAL DEPOSITION OF

11                      COLIN SKARIA

12                     MARCH 11, 2021

13   _____

14            ORAL DEPOSITION OF COLIN SKARIA, produced as

15   a witness duly sworn by me at the instance of the

16   Defendant, Abbott Laboratories, Inc., was taken in

17   the above-styled and numbered cause on the 11th day

18   of March, A.D., 2021 from 9:42 a.m. to 5:55 p.m.,

19   before Kellie L. Rowbotham, CSR in and for the State

20   of Texas, reported by stenographic means, at the

21   offices of Fishman, Jackson, Ronquillo, PLLC, located

22   at 13155 Noel Road, Suite 700, Dallas, Texas  75240,

23   pursuant to the Federal Rules of Civil Procedure and

24   the provisions stated on the record or attached

25   hereto.



```
 1                    A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFF:

 4         Mr. Vincent Bhatti
           THE BHATTI LAW FIRM, PLLC
 5         14785 Preston Road
           Suite 550
 6         Dallas, Texas  75254
              (214) 253-2533
 7            vincent.bhatti@bhattilawfirm.com

 8

 9    FOR THE DEFENDANT FORTITUDE SYSTEMS
      INTERNATIONAL, LLC:
10
           Mr. Andrew Soule
11         FISHMAN JACKSON RONQUILLO, PLLC
           13155 Noel Road
12         Suite 700
           Dallas, Texas  75240
13            (972) 419-5540
              asoule@fjrpllc.com
14

15    FOR THE DEFENDANT ABBOTT LABORATORIES, INC.:

16         Ms. Stephanie Johnson Manning
           SEYFARTH SHAW, LLP
17         700 Milam
           Suite 1400
18         Houston, Texas  77002
              (713) 2225-1001
19            smanning@seyfarth.com

20

21    ALSO PRESENT:

22         Mr. Mark Hendrix - Videographer

23

24

25
```



```
 1                            INDEX
 2                                                       PAGE
    Appearances........................................2
 3
    Stipulations.....................................--
 4
    COLIN SKARIA
 5        Examination by Ms. Manning ..................5
 6  Reporter's Certificate.........................225
 7  Signature and Changes..........................228
 8
 9                          EXHIBITS
10  NUMBER          DESCRIPTION                        PAGE
11  Exhibit 1       Resume of Colin Skaria              20
12  Exhibit 2       Documents produced by Innovista     33
13  Exhibit 3       10/18/18 E-mail chain between Lex    64
                    Gaumer and Colin Skaria
14
    Exhibit 4       10/18/18 E-mail chain between Lex    64
15                  Gaumer and Colin Skaria
16  Exhibit 5       10/18/18 E-mail chain between Lex    69
                    Gaumer and Colin Skaria
17
    Exhibit 6       Fortitude Exclusive Agency          75
18                  Agreement
19  Exhibit 7       10/19/18 E-mail from Lex Gaumer     76
                    to Colin Skaria
20
    Exhibit 8       11/1/18 and 11/2/18 E-mail chain    93
21                  between Lex Gaumer and Colin Skaria
22  Exhibit 9       Text messages, Skaria 367 - 379     97
23  Exhibit 10      11/2/18 E-mail from Colin Skaria    98
                    to Lex Gaumer
24
    Exhibit 11      11/1/18 and 11/5/18 E-mail chain    99
25                  between Lex Gaumer and Colin Skaria
```



```
 1                      EXHIBITS CONTINUED

 2     NUMBER          DESCRIPTION                    PAGE

 3     Exhibit 12      Fortitude agreement with Colin   101
                       Skaria
 4
       Exhibit 13      11/8/18 E-mail from Lex Gaumer to  103
 5                     Colin Skaria

 6     Exhibit 14      Master Services Agreement        104

 7     Exhibit 15      11/20/18 E-mail from Lex Gaumer   132
                       to Colin Skaria
 8
       Exhibit 16      1/21/19 E-mail from Colin Skaria  157
 9                     to Lex Gaumer

10     Exhibit 17      Plaintiff's First Amended        166
                       Complaint
11
       Exhibit 18      Plaitiff's Objections and        211
12                     Responses to Abbott Laboratories,
                       Inc.'s First Set of Interrogatories
13
       Exhibit 19      Tax Return                       213
14

15

16

17

18

19

20

21

22

23

24

25
```



1                    P R O C E E D I N G S

2               VIDEOGRAPHER:  Today's date is

3    March 11th, 2021.  We are on the record at

4    approximately 9:42 a.m. in the deposition of Colin

5    Skaria, start Media 1 in the case of Colin Skaria

6    versus Fortitude Systems International, LLC and

7    Abbott Laboratories, Inc.

8               Would all counsel please introduce

9    yourselves for the record after which the court

10   reporter will swear in the witness.

11               MR. SOULE:  Andy Soule on behalf of

12   Fortitude.

13               MS. MANNING:  Stephanie Manning on

14   behalf of Abbott Laboratories.

15               MR. BHATTI:  Vincent Bhatti on behalf

16   of Colin Skaria, Plaintiff.

17                    COLIN SKARIA,

18   having been first duly sworn, testified as follows:

19                    EXAMINATION

20   BY MS. MANNING:

21      Q    I'll ask you to state your full name for the

22   record, please.

23      A    Colin Skaria.

24      Q    Okay.  Do you have a middle name?

25      A    No.



1       A    Can you repeat that question?

2       Q    While you were employed by Innovista, you

3    came in contact with Fortitude, correct?

4       A    Fortitude contacted me, yes.

5       Q    Okay.  So when was that?

6       A    I believe sometime in -- I am not sure.

7    Approximately maybe September of 2018.

8       Q    Okay.  And so how did that relationship

9    form?

10      A    Like any other contract.  They saw my

11   resume.  They got a hold of my resume.  They

12   contacted me.

13      Q    At that point did they have -- did they talk

14   to you about a specific position?

15      A    Yes.

16      Q    What position?

17      A    A business analyst position.

18      Q    And what did they tell you about that

19   business analyst position?

20      A    They told me it was with their preferred

21   vendor -- I mean they're the preferred vendor for the

22   client Abbott Labs, and the hiring manager had good

23   relationships with the manager -- the hiring manager.

24      Q    Okay.  So let's break this down.  So who did

25   you have contact with?



1        A    I was initially contacted by Lex Gaumer of

2   Fortitude Systems or Fortitude International Systems.

3        Q    Okay.

4        A    And I believe we had a few phone

5   conversations and e-mails.  And then she connected me

6   with her manager, Cameron Costello.  Or Cam Costello.

7        Q    Okay.  Is the only position you spoke with

8   Fortitude about the BA position, or did you speak

9   with Fortitude about other positions?

10       A    I am not sure.

11       Q    Had you ever talked to anybody at Fortitude

12  before they reached out to you?

13       A    I don't -- I'm not sure.

14       Q    And how did they reach out to you?

15       A    Phone and e-mail.

16       Q    Did you save that e-mail?

17       A    Say that again.

18       Q    Did you save that e-mail, that initial

19  contact e-mail?

20       A    I am not sure.

21       Q    And so your initial conversation was with

22  Lex?

23       A    Yes.

24       Q    Okay.

25       A    For this position.



1      Q    Well, do you think you talked to anybody

2    else at Fortitude about another position?

3      A    I am not sure.  I don't recall.

4      Q    Okay.  When do you think that first

5    conversation with Lex happened?

6      A    Repeat.

7      Q    When do you think that first conversation

8    with Lex happened?

9      A    It could be sometime in September.

10   Approximately September.  I'm not sure again.

11     Q    Okay.  And to the best of your recollection,

12   using as precise words as you can, what did Lex tell

13   you about the position?

14     A    Lex said that their company, Fortitude

15   Systems, has a client that has a requirement for a

16   business analyst and she had come across my resume

17   and wanted to see if I was available for a contract

18   position.

19     Q    And did you know what she meant by a

20   contract position?

21     A    Yes.

22     Q    What is a contract position?

23     A    It's not a full-time position.  It's working

24   as a contractor.

25     Q    Without benefits, correct?



1       A    Yes.

2       Q    So why did this position appeal to you if it

3    was a contract position meaning unlikely to -- it's

4    not a full-time gig and didn't have benefits?

5       A    Because they -- Fortitude Systems had told

6    me that this is with their preferred client, and they

7    have a very good relationship with this manager.

8    They have placed a lot of people at Abbott and

9    specifically with this manager.  And this position

10   after six months -- Abbott does not keep contractors

11   for long.  They will hire them as full time.

12      Q    So their experience with Abbott was that

13   Abbott tended to hire people after a contract or

14   project ended?

15      A    Represent that question again.

16      Q    So they were telling you that in their

17   experience with Abbott, Abbott would sometimes hire

18   people after a project was complete?

19      A    Not sometimes.  Almost always.

20      Q    And she said "almost always"?

21      A    Yes.  Both her and Cameron Costello.

22      Q    Okay.  I just want to talk about the

23   conversation you had with Lex that first

24   conversation.

25      A    Sure.



1  know how many layers in between if it's
2  subcontractors or multiple contractors working with
3  their client.  That gives the contractor more
4  guarantee in terms of an interview opportunity or
5  even landing that position.
6       Q   And this was said in the first conversation
7  with Lex?
8       A   I don't recall.
9       Q   Okay.
10      A   Can I ask for a quick break?
11      Q   Yeah.  I was just going to say let's take a
12  quick break.
13              MR. BHATTI:  Yeah, me, too.
14              VIDEOGRAPHER:  We're off the record at
15  10:45.  End Media 1.
16              (Short recess.)
17              VIDEOGRAPHER:  We're on the record at
18  10:50.  Start Media 2.
19      Q   (BY MS. MANNING)  Okay.  I just want to take
20  a step back.  Did you interview with any other
21  potential employers while you were employed
22  by Innovista?
23      A   I don't know.
24      Q   Were you applying at other places?
25      A   I don't know.



1    interest in the position?

2        A   I said I was open.

3        Q   What questions did you ask, if any?

4        A   I asked her if Abbott was, in fact, their

5    client, if they're preferred vendors.

6        Q   Okay.  And what was her response?

7        A   Yes.

8        Q   What else did you ask?

9        A   What was the position or what was the role,

10   the requirement.

11       Q   And what did she tell you?

12       A   Business analyst.

13       Q   And what did you understand that to mean?

14       A   I don't understand your question.

15       Q   When she said "business analyst," what did

16   that mean to you?

17       A   Similar to roles I've done in the past.

18       Q   Did you ask any follow-up questions after

19   she said it was a business analyst position?

20       A   I did ask questions with reference to the

21   project itself.

22       Q   Okay.  What questions did you ask?

23       A   Where is the project located.  Is this going

24   to be through Fortitude, is it a W-2 or a contract

25   position, meaning a corp to corp, a C to C, or is it


Appx. 13

```
 1   purely a W-2 type of work.

 2        Q    Okay.  So when you asked where, what did she

 3   say?

 4        A    Plano.

 5        Q    Okay.  When you asked if it was through

 6   Fortitude Systems, what did she say?

 7        A    Yes.

 8        Q    When you asked if it was a W-2 or contractor

 9   position, what did she say?

10        A    She said it's a contractor position and she

11   could work corp to corp.  I asked if there is any

12   middle layers.  She said there's no middle layers.

13        Q    And what did you mean by "middle layers"?

14        A    If there's any other contractors through

15   whom I would have to go or if they're a

16   sub-contractor to anybody else.

17        Q    Okay.  And when she said you could work corp

18   to corp, what does that mean to you?

19        A    It means my corporation can -- can directly

20   have business relationship with Fortitude Systems

21   working with Abbott as their client.

22        Q    Okay.

23              MR. SOULE:  Sorry.  Can you repeat your

24   answer, please?

25              THE WITNESS:  Yeah, sure.  So she said
```



1   corp to corp is where my corporation can have a

2   business relationship with Fortitude Systems

3   representing me as an employee working for their

4   client Abbott Labs.

5       Q    Is there an advantage of you doing corp to

6   corp?

7       A    Maybe in terms of a rate, an hourly rate.

8       Q    Okay.  Anything else you asked her?

9       A    Yes.  What was the pay for the position,

10  what was the rate.

11      Q    And what was her response?

12      A    $65 an hour.

13      Q    Any other questions that you asked her?

14      A    I don't remember.

15      Q    So as you sit here today, you don't remember

16  any other questions you asked her?

17      A    I don't.

18      Q    As you sit here today, do you remember

19  anything else that Lex said that we have not talked

20  about in that first conversation?

21      A    I don't know.

22      Q    So as you sit here today, you don't remember

23  any other statements by Lex in that first

24  conversation; is that correct?

25      A    I don't know.



1        Q   Okay.  And so in this e-mail it's just -- so

2   it's a chain as well, correct?

3        A   I don't know.  I don't know if it's

4   continuous or not.

5        Q   You can review it.  There's an e-mail

6   response on Thursday, October 18th, 2018 at 11:10

7   a.m., correct?  It's on Page 2.

8        A   It looks like a response, yes.

9        Q   That's your e-mail, right?

10       A   Yes.

11       Q   Okay.  So in this e-mail she is confirming

12  you for an interview at Abbott on October 22nd,

13  correct?

14       A   In this e-mail, yes.

15       Q   In this e-mail, yes.  And she tells you Cam

16  will be there to meet you, right?

17       A   Yes.

18       Q   Give him a call when you arrive.

19       A   Yeah.

20       Q   And give him a call when you're done,

21  correct?

22       A   Yes.

23       Q   She gave you their address.

24       A   Yes.

25       Q   Is that the first time you had received the



COLIN SKARIA                                    March 11, 2021
COLIN SKARIA vs FORTITUDE SYSTEMS                         83

```
 1    conversations with Lex, yes.

 2         Q    Before your interview with Abbott.

 3         A    Yes.

 4         Q    Okay.  Are you relying on any representation

 5    that she made in a phone call to support your claims

 6    in this case before your interview with Abbott?

 7                   MR. BHATTI:  Objection, form.

 8         A    I don't know.

 9         Q    You don't know?

10         A    I don't know.

11         Q    All right.  Let's talk about the day of the

12    interview.  Do you remember the day of the interview?

13    I'm not asking about the date.  But just do you have

14    recollection of the day you interviewed at Abbott?

15         A    Parts of it, yes.

16         Q    Okay.  So what do you remember about that

17    day?

18         A    I remember going to the facility in Plano,

19    the Abbott facility in Plano.  I remember

20    interviewing with the hiring manager and his

21    technical lead.  I remember calling Cameron when I

22    got there and after I left the interview.  That's...

23    That's mostly what I remember.

24         Q    Okay.  So was your interview with the hiring

25    manager -- and that was Denis Ortleb, correct?
```



1      A    To my understanding that was Denis Ortleb.

2      Q    So you had a conversation with him.  Was

3  that just with Denis?

4      A    I had an interview with him.

5      Q    Okay.  And then you had a separate interview

6  with his technical lead.

7      A    Yes.

8      Q    And was that Thomas Fimiani?

9      A    I'm not sure.  I think his name was Thomas.

10     Q    Okay.  What do you remember about your

11  interview with Denis?

12     A    Denis asking me questions from my resume, my

13  experience and him telling me about Abbott Labs and

14  his team and that this was a long-term project.

15     Q    Long-term project?

16     A    Uh-huh.  I remember him telling me Abbott is

17  a great place to work, especially if this turns out

18  to be a permanent position, that it's a great place.

19  And he shared his experience working at Abbott Labs.

20     Q    So he said if it turns out to be a permanent

21  position.

22     A    I don't recollect the exact words.

23     Q    But you're not saying that he says this is

24  a -- this will turn into a permanent position,

25  correct?



1    I don't remember.

2         Q    But in this -- in this e-mail she's sending

3    you paperwork, correct?

4         A    Yes.  She attached some paperwork, yes.

5         Q    So she's sending -- she's asking you to send

6    copies of a voided check, correct?

7         A    Yes.

8         Q    Corporation certificate insurance?

9         A    Yes.

10        Q    And two forms of ID?

11        A    Yes.

12        Q    And then there are several attachments to

13   this e-mail, a background investigation form,

14   correct?

15        A    Yes.  Six attachments.

16        Q    Emergency contact info?

17        A    Yes.

18        Q    A form W-9?

19        A    Yes.

20        Q    Okay.  Why a W-9 and not a W-4?

21        A    I don't know.

22        Q    So -- and then an ADP direct deposit sign-up

23   form.

24        A    Yes.

25        Q    Okay.



1        A    It looks like their standard set of forms,

2   yeah.

3        Q    A confidentiality agreement?

4        A    Yes.

5        Q    And then a Master Services Agreement.

6        A    Yes.

7        Q    Okay.  And then you sent her back the next

8   day the signed background, correct?

9        A    Yes.

10        Q    The confidentiality?

11        A    Yes.

12        Q    And then the signature pages on the Master

13   Services Agreement.

14        A    Yes.

15        Q    Okay.

16        A    A quick question.  We are looking at

17   Exhibit 8?

18        Q    8, yes.

19        A    Okay.  I just want to make sure.  Sorry.

20        Q    So from her e-mail and your communications

21   with Cam and Lex, was it your understanding that

22   starting the Abbott opportunity was -- strike that.

23             Did you understand that you needed to

24   provide all the information she requested in

25   Exhibit 8 to start the Abbott position?



Appx. 20

1       A    Say that again.

2       Q    Yes.

3              MS. MANNING:  Can you read that back?

4              (Reporter read last question.)

5       A    Yes.

6       Q    And the next day you sent several of those

7    items, correct?

8       A    Yes.

9       Q    All right.  I'm going to hand you Exhibit 9.

10             (Exhibit 9 marked.)

11      Q    And if you'll turn with me to Skaria 372 at

12   the bottom.

13      A    Okay.

14      Q    And this appears to be some e-mail -- or

15   sorry -- text messages between you and Lex Gaumer; is

16   that correct?

17      A    Yes.  That's what it looks like.

18      Q    And is this the first time that Lex texted

19   you?

20      A    First time ever or since the offer?

21      Q    Ever.

22      A    I don't know.

23      Q    Were you texting before the interview?

24      A    I'm not sure.  I believe so.

25      Q    So did you provide your attorney all of the



 1   requested my corporation information registered with

 2   the state.  So I guess I was just checking on the

 3   correct name and I guess the EIN number and all that

 4   stuff that they want.

 5        Q    Okay.  So at what point in time did the

 6   corporation -- was the corporation Magnum Solutions

 7   raised in your discussions with Fortitude?

 8        A    I believe when we discussed rates I had

 9   asked Fortitude if I could work with them on a

10   corporation basis.

11        Q    Was this before your interview?

12        A    Yes.

13        Q    So it was at your request to do a

14   corporation to corporation?

15        A    Yes.  I asked if that was an option.  She

16   said yes.

17        Q    And you wanted that option?

18        A    I was okay with any option.  But, you know,

19   if they were okay with corporation, that would give

20   some wiggle room for a few extra dollars an hour.

21        Q     I'm going to hand you Exhibit 12.

22                  (Exhibit 12 marked.)

23        Q    Did you sign a confidentiality agreement

24   with Fortitude?

25        A    I don't remember.



Appx. 22

1        Q    Okay.  Any doubt that you -- that this is
2   not an authentic e-mail?
3        A    No.  I don't have any doubts.
4        Q    Okay.  And this says it's the signed Master
5   Services Agreement, correct?
6        A    Yes.  That's what her e-mail says.
7        Q    Let's look at the Master Services Agreement.
8   This will be Exhibit 14.
9             (Exhibit 14 marked.)
10       Q    Did you review this prior to your deposition
11  today?
12       A    I quickly looked at it.  I don't know if
13  this is the same exact MSA.
14       Q    Do you have two MSAs?
15       A    The one that I signed and gave Fortitude,
16  yes, I quickly looked over that one.
17       Q    Okay.
18       A    I'm assuming this is the same one.
19       Q    All right.  Well, let's go to -- let's go
20  to 58.
21       A    58?
22       Q    Skaria 58.
23       A    Okay.
24       Q    And this appears to be a signature page,
25  correct?



1        A    Yes.   That looks like my signature, correct.

2        Q    Okay.  So that's your signature there under

3    the block that says, "Magnum Solutions, Inc."

4        A    Yes.

5        Q    And you signed it in your capacity

6    as President.

7        A    Yes.

8        Q    And you signed it on November 11 -- I'm

9    sorry -- November 1st of 2018.

10       A    Yes.

11       Q    Okay.  And then under the Fortitude block

12   someone named Ben Khoury signed it.  Do you see

13   that?

14       A    Yes.

15       Q    Manager of Business Operations?

16       A    That's what it says, yes.

17       Q    Had you had any contact with Mr. Khoury?

18       A    Not that I recall.

19       Q    Okay.  And he signed this on 11/5/2018.

20       A    That's the date he has, yes.

21       Q    But that's the date he has it as being

22   executed, right?

23       A    Yes.

24       Q    So you talked a little bit about Magnum

25   Solutions, Inc.  That's a corporate entity that you



1   created?

2       A    Yes.  It's registered with the state.  It

3   was.

4       Q    Okay.

5            MR. SOULE:  With what?

6            THE WITNESS:  With the state.  The

7   state of Texas.

8       Q    So Magnum Solutions is the party to the MSA

9   instead of you because you wanted to have a

10  corporate -- corporation-to-corporation agreement

11  with Fortitude, correct?

12      A    Say that again.  I'm sorry.

13      Q    So you signed in your capacity as President

14  of Magnum Solutions, Inc. and not your individual

15  capacity.

16      A    Uh...

17      Q    Because you elected to have the agreement

18  between two corporations, correct?

19      A    Yes.

20      Q    Okay.  When was Magnum Solutions, Inc.

21  created?

22      A    I don't remember what the incorporation date

23  was.  If I'm not -- I don't want to quote -- I don't

24  know the exact date, but it could be somewhere around

25  the time of, you know, when they presented this



1   opportunity once it was going to be formal.

2       Q   Okay.  Did you -- so prior to speaking to

3   Fortitude, Magnum Solutions, Inc. did not exist?

4       A   Not in the state of Texas.

5       Q   Okay.  Where did it exist?

6       A   Philadelphia, Pennsylvania.

7       Q   Okay.  So when was it created?

8       A   Again, I don't know the exact date, but I

9   would think somewhere around 2012.  Possibly August.

10  Maybe July or somewhere around there when I started

11  working as a contractor for TATA Consultancy

12  Services.

13      Q   So with TATA you were just a contractor, not

14  a W-2 employee?

15      A   Initially I was a contractor, and then they

16  took me on board because they were happy with my

17  performance and all of that.  So the client was happy

18  with my work, and they wanted to keep me long

19  term, yes.

20      Q   So you went from a contractor to a W-2

21  position?

22      A   Yes.

23      Q   And so what -- what state is Magnum

24  Solutions, Inc. created -- what laws are they created

25  under?  Is it Pennsylvania?  Delaware?  What kind



1   it was -- I forget the guy's name.  Ben Khoury's

2   signature, yes.

3        Q    Okay.  Did you read this MSA before you

4   signed it?

5        A    I am not sure.

6        Q    Okay.

7        A    I'm not sure if I read it in its entirety.

8   I must have read parts of it that pertain to my

9   hourly rate, the position, it states consulting

10  company and me as the representative of the company.

11            MR. SOULE:  Can you repeat what you

12  read?  I'm sorry?

13            THE WITNESS:  So I said I must have

14  read portions where it pertains to my salary, or my

15  hourly rate, the company -- or my company and me as a

16  representative of the company.

17       Q    Okay.  Did you think that Abbott was a party

18  to this agreement?

19       A    I would think so.

20       Q    Why would you think that?

21       A    Because that's what it says on the

22  agreement, that Abbott and Fortitude are on this

23  contract.

24       Q    So it says Abbott Labs, and then it says the

25  Company.  But look with me at Paragraph 2.  It says,



1   contracts or anything like that.  I would have my

2   attorney look at that.

3        Q    Okay.  Did you have an attorney look at the

4   Master Services Agreement?

5        A    Not at that time.  I didn't have an

6   attorney.

7        Q    So you think Abbott was a party to this

8   Master Services Agreement.  Is that correct?

9        A    That is my thought.

10       Q    And did it not concern you that there was no

11  signature by anyone at Abbott?

12              MR. BHATTI:  Objection, form.

13       A    Again, I am not versed in contracts or how

14  contracts are written up.  So I didn't -- I didn't

15  have to look -- I didn't look for anything as far as

16  if Abbott was on or if they had signed or not because

17  Fortitude had told me something, and I went by what

18  they had told me.

19       Q    Okay.  Just so I'm clear --

20              MR. SOULE:  Object to the

21  responsiveness.

22       Q    You went by what Fortitude told you, not

23  what was in the Master Services Agreement?

24       A    I don't understand your question.

25       Q    Well, you just testified that you went by



1   what Fortitude told you; is that correct?

2       A   They told me, and I assumed what they told

3   me was what all this paperwork is.  Again, I'm not

4   familiar with the contract.

5       Q   Well, have you ever read a contract?

6       A   I have read contracts, but not something

7   this long.  And this has so many parts to it.  Like I

8   said, I only read certain parts that concerned me.

9   And Fortitude had assured me that this is their

10  standard contract agreement that they send out to all

11  clients.

12              MR. SOULE:  Object to the

13  responsiveness.

14      Q   Do you see in Paragraph 3 where it says,

15  "This agreement does not guarantee any minimum amount

16  of work or payment"?

17      A   Where are you looking at?

18      Q   Middle of Paragraph 3, third line down

19  towards the end.

20      A   "This agreement does not guarantee any

21  minimum amount of work or payment."  Yes.  I see

22  that.

23      Q   Okay.  Did you take note of that before you

24  signed this?

25      A   I don't remember.



1   contract between Fortitude and the Client, which

2   shall require the Client to provide Assigned Workers

3   a suitable place of work that complies with

4   applicable federal, state, and local health and

5   safety laws."

6        A    I see that in point B.

7        Q    Did you understand that Fortitude should

8   provide you the contract between Fortitude and the

9   client?

10       A    I don't understand that part.

11       Q    Okay.  Did you ever ask for a contract

12  between Fortitude and Abbott?

13       A    I don't remember.

14       Q    Is that something you would think to ask?

15            MR. BHATTI:  Objection, form.

16       A    I don't know.

17       Q    Okay.  Do you see in 7 -- Paragraph 7,

18  "Independent Contractor Status," the last word of the

19  third line down, "Nothing contained in this agreement

20  shall be construed to create an agency or joint

21  employer relationship between Fortitude, the Client

22  and/or the Company."  Do you see that?

23       A    I see that sentence, yes.

24       Q    Did you read that before you signed?

25       A    I don't remember.  I don't remember.



1        Q    Okay.  All right.  Let's look at Page 12.

2   All right.  So did you read this before you signed

3   it?

4        A    I don't remember --

5        Q    Okay.  So this is made by Magnum

6   Solutions, Inc., identified as the company.  Do you

7   see that?

8        A    It says, "This Worker Acknowledgement and

9   Confidentiality Agreement (the 'Agreement') is made

10  in consideration of my assignment by [Magnum

11  Solutions, Inc.] ('Company'), which may assign me to

12  provide temporary services to [Abbott Labs]

13  ('Client')."

14       Q    Right.  So clearly identified Abbott Labs as

15  Client, correct?

16       A    I don't know.

17       Q    Well, can you see the reference --

18       A    I see the word "Abbott Labs," and I see the

19  word "Client," but I don't know if they're two

20  separate or if the client means -- if it is for

21  Abbott Labs.  I don't know how they write these.

22  Like I said, I'm not an expert on contracts.

23       Q    But you do hold two Bachelor's degrees in

24  Business, correct?

25            MR. BHATTI:  Objection, form.



1       Q    Did you ever provide a certificate of

2  insurance?

3       A    I don't remember.

4       Q    Would that not be part of your corporate

5  records from Magnum Solutions?

6       A    I don't know.

7       Q    Do you remember reaching out to insurance

8  agencies to obtain the appropriate insurance required

9  under the contract?

10       A    I don't remember to be honest.

11       Q    Okay.  Do you know if you ever provided the

12  W-9?

13       A    I don't know what the W-9 is.

14       Q    You don't know what a W-9 is?

15       A    I don't know.

16       Q    Okay.  Okay.  So this e-mail is dated after

17  what you contend would have been your start date at

18  Abbott, correct?

19       A    Can you repeat your question?

20       Q    So this e-mail is dated November 20th?

21       A    That's the date on the e-mail, yes.

22       Q    It's being sent after the date that you

23  contend you were supposed to start at Abbott,

24  correct?

25       A    This looks like the date they had -- this



 1   date is definitely after the first date they told me

 2   I was going to start.

 3        Q    Right.  Okay.  Back to that e-mail, did you

 4   ever send a voided check?

 5        A    I don't remember.

 6        Q    Okay.  Does, or did, Magnum Solutions, Inc.

 7   ever have a bank account?

 8        A    I don't remember.

 9        Q    How did you learn that you wouldn't start on

10   November 19th?

11        A    I think Cameron Costello called me and said

12   that my laptops are in, they're just waiting for an

13   executive vice president, or EVP, to actually sign

14   off on the actual start date.  So there's some delay

15   because this vice president is traveling.  So they're

16   just waiting for him to come back and sign that.  He

17   was expected to be there, but his travel got, I

18   guess, pushed forward or something.  That's my

19   recollection.

20        Q    Okay.  Let's go back to the texts.

21        A    Exhibit 9?

22        Q    Exhibit 9, yes.  Do you see the one --

23   it's -- let's go to Skaria 374.

24        A    Okay.

25        Q    And this is dated November 27th of 2018.

```
 1        A    I did reach out to Denis Ortleb, yes.

 2        Q    And how did you get his contact

 3   information?

 4        A    I believe I called the office.  I'm not

 5   sure.  I think somebody connected me to his phone.

 6   And I believe he called me back.

 7        Q    Okay.  So why did you reach out to him

 8   directly?

 9        A    Because it was a dead-end.  Cameron was not

10   giving me any updates, and he wouldn't call back, or

11   he just wouldn't respond back.  And Lex would just

12   keep calling me trying to comfort me and, you know,

13   console me, whatever the term is, just console me.

14             But I would never hear back from

15   Cameron.  So I had to -- I had to decide for myself

16   and my family because we had been going since

17   November all the way into the new year, you know, not

18   knowing if this was going to work.  Having worked in

19   previous companies, I don't know if it took this long

20   for EVPs or anybody to sign on projects or especially

21   contracts.  Contracts are of immediate need, and so

22   these happen sooner, and it usually works the reverse

23   way.

24             They first get the authorizations or

25   permissions before they even sign or decide to take a
```



1   contract on board.  So at some point I -- you know,

2   because I hadn't heard back from Fortitude.  I had to

3   call Denis.  And if what Cameron -- because he was

4   leading me on with lies and lies and lies.  So I

5   didn't know what the actual truth was.

6       Q   Okay.  So at what point did you reach out to

7   Mr. Ortleb?

8       A   I think it was -- are you asking a time or

9   like --

10      Q   A date.

11      A   I don't know an exact date, but I think it

12  was the first week of January maybe.  I'm not sure.

13  Approximately the first week of January maybe to find

14  out from Denis if they're still waiting on vice

15  presidents or EVPs or if it was something else

16  holding up the position for me starting there at

17  Abbott.

18      Q   Okay.  And so is it fair to say you did not

19  speak or communicate with Denis Ortleb between the

20  interview in October of 2018 and your first -- your

21  call with him in January?

22      A   Yes.  It is fair to say I haven't spoken to

23  him since.

24      Q   And no other communications, correct?

25      A   With Denis Ortleb?



1       Q   Yes.

2       A   No.

3       Q   Like no written correspondence between the

4   two of you, no e-mails exchanged, no texts exchanged?

5       A   Not that I remember.

6       Q   Okay.  So you spoke with Denis.  Tell me

7   about that conversation.

8       A   I spoke to Denis.  I thanked him for calling

9   me back if I remember correctly.  And I asked

10  Denis -- I hadn't heard from Cameron -- if he could

11  provide an update.  And Denis told me that Fortitude

12  Systems was not a preferred vendor of Abbott, and he

13  is pushing very hard for Fortitude to become a

14  preferred vendor.

15          And he said that he would very much

16  like if I still took the position.  And I asked him

17  when does he anticipate a start date, and he said he

18  never knew.  It could go on forever.  But he also

19  said that he understands if I had to look for other

20  positions or interview for other projects or

21  especially because it's financially hurting the

22  family and all of that.  So yes.

23      Q   Okay.  Anything else that Mr. Ortleb said in

24  that phone call?

25      A   He said as soon as he hears or if he knows



 1  Abbott.

 2      Q    Okay.  And no one from Abbott ever

 3  communicated an offer of employment to you, correct?

 4      A    I don't remember if they spoke of any offer.

 5  But Denis Ortleb at Abbott interviewed me for this

 6  position and also spoke to me after the interview

 7  about this position still being available, still

 8  being there for me and that he would like if I took

 9  that position.

10      Q    But at that point it was contingent upon

11  Fortitude being an approved vendor, correct?

12      A    Yes.  He did say that.

13      Q    And he did not communicate any sort of start

14  date for you, correct?

15      A    No.  He said this could take a day.  It

16  could take weeks.  It could take months.  It could

17  take years.  And from what I remember, he said with

18  the magnitude of a company like Abbott, it could be

19  forever.

20      Q    Okay.  Did you discuss rate with Mr. Ortleb?

21      A    Did I discuss what again?

22      Q    Rate of pay.

23      A    I don't recall if I discussed anything about

24  pay with Denis Ortleb.

25      Q    I want you to look with me at Page 5.  Okay.



1   specifically asked me about it.

2       Q   Well, I asked about all the conversations

3   you had with Cam Costello that you remember, and that

4   did not come up.

5       A   When you asked me, that's what I remembered.

6   Now that I remember this, I just told you that.

7       Q   Okay.  So are you saying that Cameron asked

8   you to refrain from seeking other employment?  Was

9   that -- at what point was that conversation?

10      A   Was once -- once I had gotten the interview.

11  But then he also was constantly checking -- he would

12  call to check if -- you know, if there's any other

13  potential projects or any other vendors that I'm

14  talking to or if there's any other offers in the line

15  or things of that nature.

16      Q   And were there?

17      A   I don't remember if there was any interviews

18  or anything that I could have interviewed prior to

19  the interview with Abbott.

20      Q   Any other actions that you took in reliance

21  on the representation, or purported representation,

22  that Fortitude was an approved vendor?

23      A   Say that question again.

24      Q   Any other action that you took in reliance

25  on the purported representation that Abbott -- or



1   Fortitude was an approved Abbott vendor?

2       A    Yes.  When I did some shopping I purchased

3   some items for home knowing I was going to get a

4   project and get paid.  And I was going to start on a

5   certain date.

6       Q    What items did you purchase?

7       A    I bought a brand new TV.  I brought a home

8   theater system, a speaker system for my media room

9   and my living room.

10      Q    And you did all that before actually

11  starting the position?

12      A    Yes.  It was a credit.  It was Thanksgiving

13  holidays.  There were deals going on.  So I thought

14  I'll just get it when the deals are there.

15      Q    Okay.  What evidence do you have that those

16  in the decision-making process knew that Fortitude

17  was not an approved vendor at the time of your

18  interview?

19      A    Well, I would assume any company that

20  invites you to their facility for an interview, if

21  it's HR or even the hiring manager, would know --

22  especially that worked with that particular vendor in

23  the past years and they've accepted contractors

24  through them -- I would assume that the relationship

25  was well set and they already know what they are



 1   That's how it has been in the past for other jobs

 2   that I've worked in other contract positions.

 3       Q   And so based on experiences, none of which

 4   were with Abbott or Fortitude, you assumed that that

 5   had been -- that they had discussed the approval of

 6   Fortitude, correct?

 7       A   That who had discussed?

 8       Q   Abbott and Fortitude.

 9       A   I don't know what they discussed.

10       Q   Okay.  Go to Page 8 of the complaint.

11       A   I'm on Page 8.

12       Q   All right.  Let's look at Paragraph 63.  It

13   says, "The above described acts, omissions, failures

14   and conduct of Defendants have caused Plaintiff

15   damages which include, without limitation, the costs

16   associated with damage to him."  Do you know what

17   that means?

18       A   Give me a second.  I just want to read

19   through it.

20       Q   Okay.

21       A   I don't know what the above described is.

22   Is it the entire document?

23       Q   Yes.

24       A   I didn't read the entire document.  Yeah, I

25   don't -- I'm not sure I understand the entirety of



1   it.

2        Q    Okay.   What damages are you seeking from

3   Abbott in this litigation?

4        A    I don't know.   I would ask my attorney to

5   answer that.

6        Q    I need to know what damages you are seeking

7   in this litigation.

8        A    Like I said, I don't know how to calculate

9   the damages or how this works.   So I hired my

10  attorney to do that for me.

11       Q    Okay.   But I don't get to depose your

12  attorney.   I get to depose you.   So I need to know

13  what you think you are entitled to because of the

14  actions of Abbott.

15            MR. BHATTI:   Objection, form.

16       A    Like I said, I don't know.

17       Q    What out-of-pocket damages -- were you out

18  of any money because of --

19       A    I didn't have an income.   I had two kids to

20  feed, my wife, a home, mortgage, credit cards.   I had

21  to take credit cards just to support the family, take

22  loans from church members for expenses related to my

23  daughter's therapy and other expenses for home, like

24  food.

25       Q    How much in loans did you have to take out?



Appx. 41

1      A    I don't remember exactly.  I can tell you

2   definitely -- I don't know.  I don't know an exact

3   number.  I know I did receive checks from church

4   members.

5      Q    What about credit cards?

6      A    I had to open at least three -- maybe four.

7   I'm not sure of the exact number to get a balance

8   transfer which would provide cash that I can borrow.

9   And I had to pay fees on that oftentimes because I

10  was not able to pay back.  And I had to pay interest

11  and fees.

12     Q    Okay.  How much in -- how much --

13     A    I don't know.  I don't remember.  I'm sorry.

14     Q    Well, we asked for these documents in

15  discovery, and I didn't receive any documents.  So

16  I...

17     A    I don't know.  Some of those credit cards

18  are probably closed by now.  And I had made the

19  effort to reach out to some of those companies, but I

20  don't know if there's -- because of the time I wasn't

21  able to get it by the time my attorney was requesting

22  it from me.

23     Q    So what job search efforts did you --

24  actually back up.  In your complaint you are alleging

25  exemplary damages per Paragraphs 64 and 65.  What



1      A   I want to understand your question.  That's
2   why I'm asking.
3      Q   Okay.
4      A   What do you mean by -- are you asking in
5   November, or are you asking after November?
6      Q   After.
7      A   You know, this could be January, February,
8   March, you know, through December of 2019.
9      Q   Okay.  Let's start over.
10      A   Okay.
11      Q   Tell me about your job search efforts after
12   November 2018 when you didn't start the contractor
13   role at Abbott.
14      A   I am still not sure I understand your
15   question.  I am trying to understand if "after" means
16   right after.
17      Q   When did you begin looking for other
18   employment?
19      A   I am not so sure, but I think sometime in --
20   maybe in February, March, April of 2019 and so on
21   going forward until I received my next job at
22   AmerisourceBergan in I think it was June of 2019.
23      Q   Okay.  Did you receive any interviews during
24   that time period other than with AmerisourceBergan?
25      A   I don't remember.  I could have interviewed



1   with other vendors for open projects or other

2   positions.

3        Q   So you don't remember if you interviewed

4   with those?

5        A   I don't know if I -- if I've specifically

6   interviewed or how many I interviewed with if I had.

7        Q   Okay.  And you've already mentioned

8   AmerisourceBergan.  You began there on June 3rd,

9   2019, correct?

10       A   Yes, I did.

11       Q   At a salary of $117,000 --

12       A   Yes.

13       Q   -- a year?

14       A   Yes.

15       Q   And you had benefits with that?

16       A   Yes.  And bonus, I believe.

17       Q   Okay.  During your time that you were

18   unemployment, did you have health care?

19       A   I don't remember.  I probably didn't have.

20   You're asking about just me?

21       Q   No.  Your family.

22       A   My family -- my kids did.  I'm not sure

23   about that time frame.  I'm sorry.  I don't remember.

24   They could have had Medicaid, but I'm not a hundred

25   percent.



1      Q    So what were your job duties at

2   AmerisourceBergen?

3      A    Well, I was hired as a sales force

4   programming -- programmer analyst.  I think that was

5   my title.

6      Q    Okay.  What were your job duties?

7      A    Well, it was to make sure a bunch of

8   things -- programming -- coding was one of them.

9   Working on tickets was another one, and project

10  management was another one.

11     Q    And before your initial ninety days of

12  employment were up, you were issued a corrective

13  action for poor performance and terminated,

14  correct?

15     A    I don't know if it was ninety days exactly

16  or if it was just before ninety days.  I don't

17  remember the exact -- I know I think my last date was

18  on the 27th of August.

19     Q    But you were terminated for poor

20  performance, correct?

21     A    That's what they told me.

22     Q    Okay.  Are you currently employed?

23     A    No, I'm not.

24     Q    Is that by choice?

25     A    No.  I am still interviewing.  I am still



Appx. 45

1       Q    Okay.  But I'm asking you --

2       A    Yes.  Definitely for mental anguish, yes.

3    That would be part of it.

4       Q    Okay.  So what symptoms of mental anguish

5    did you experience?

6       A    What do you mean by "mental anguish"?  Can

7    you explain exactly what that contains?

8       Q    Emotional distress.

9       A    Yes.  Stress is what I -- sort of going into

10   depression because I had resigned a job that I had

11   with benefits and medical coverage for my kids, and

12   now I don't have it even after three months, and I

13   don't have an income.

14            So I had to, like I said, borrow money

15   and open credit cards.  And so dealing with that was

16   definitely taking a huge mental toll, not only me,

17   but also the family.  We couldn't buy things for the

18   holidays.  We couldn't give any gifts for anybody,

19   not even for our own kids.  We had to stay away from

20   social gatherings or Christmas parties or

21   Thanksgiving because we couldn't afford or even go

22   and buy stuff so we can be part of the parties or

23   whatever.

24      Q    Okay.  So you said depression.  Were you

25   actually diagnosed as having depression?



1     A    When I mean "depression," I said I was
2  depressed.  I don't know if that medically means
3  depression.  I was under a lot of stress to provide
4  for my family.
5     Q    And how did that affect your daily life?
6     A    Well, what do you mean by how did it
7  affect -- in which area?
8     Q    Did it -- did it manifest itself in physical
9  symptoms of illness?
10     A    Well, I wouldn't sleep a lot, meaning I
11  would try to sit and apply all night for jobs or try
12  to see what other opportunities are there.  And most
13  of that time was also not getting an answer from
14  Fortitude, not knowing if the project was going to
15  work out or -- and also after talking to Denis, if
16  this was ever going to come through or not.  So
17  should I wait, should I not wait on this project.
18     Q    Okay.  Any physical symptoms other than
19  staying awake to apply for jobs?
20     A    Nothing other than being stressful, eating
21  due to stress and maybe getting a little pounds here
22  and there.  But I don't remember any other
23  physical -- you know, maybe headaches, talking to --
24  trying to get a hold of people or not getting a
25  response back.



Appx. 47

1      Q   You were able to get out of bed every day

2   and take care of your children and yourself?

3      A   I believe so.

4      Q   Okay.  I'm going to hand you 18.

5              (Exhibit 18 marked.)

6      Q   Do you recognize this document?

7      A   I don't remember seeing it before.

8      Q   Okay.  Do you remember answering questions

9   as part of the discovery process?

10     A   Answering questions?  By whom?

11     Q   From Abbott.

12     A   I don't know that I got anything from

13  Abbott.

14     Q   Well, your attorney would have gotten them.

15     A   My attorney had asked me questions.  I've

16  answered them, yeah.

17     Q   All right.  Let's look at -- it doesn't have

18  a page number.  But your response to Interrogatory

19  Number 9 about your --

20     A   What is interrogatory was -- whatever the

21  term is.

22     Q   Oh, it's -- it's about the third-to-last

23  page.

24     A   Third-to-last page.

25     Q   Yeah.



Appx. 48

1    something.

2         Q    All right.  If you'll go back with me

3    to 447, Part 2, Line 15.

4         A    Part 2, Line 15, okay.

5         Q    Do you see where it says "Insurance --

6         A    Yes, I see.

7         Q    -- (other than health)"?

8         A    Other than health, okay.

9         Q    And it shows nothing.

10        A    Okay.

11        Q    No expenses for insurance, correct?

12        A    Okay.  Like I said -- you know, I don't

13   remember if I actually got insurance or --

14        Q    Okay.  My question is this shows that you

15   had no expenses for insurance, correct?

16        A    On the taxes it shows there's no -- at least

17   on this document it shows there's no number put

18   against that line.

19        Q    And you signed these taxes and submitted

20   them to the federal government, correct?

21        A    I don't know if it's a federal government

22   or -- the IRS, yes.

23        Q    Attesting they were true.

24        A    Yes.

25        Q    So does that indicate to you that you did



 1  subsequent conversation Lex could have indicated and

 2  told me you don't really need that insurance part of

 3  it because you're going through Fortitude, and

 4  Fortitude has the necessary coverages for insurance.

 5      Q    But Lex also e-mailed you on November 20th

 6  saying we need this information.

 7      A    She could have e-mailed me prior to saying

 8  that.

 9      Q    And now you're just speculating right now.

10  You don't have a specific recollection?

11      A    Like I said, I don't remember exactly.  But,

12  you know, it could be.

13      Q    But you would agree with me that the Master

14  Services Agreement requires that Magnum Solutions

15  have certain levels of insurance, correct?

16      A    Like I said, I didn't read the entirety of

17  that document.  I don't know.

18      Q    We went through it today.

19      A    Yeah, we did.

20      Q    So I'm not asking what you knew at the time.

21  I'm asking what you know today.  That document

22  required Magnum Solutions to have at that type of

23  insurance.

24      A    Again, in that document, I don't know if it

25  specifically says Magnum Solutions should have this



Appx. 50

```
 1   resume the deposition at an agreed-upon time in the

 2   future.

 3              MR. SOULE:  Prior to March 26th.

 4              MS. MANNING:  Yes.

 5              MR. SOULE:  By Zoom.

 6              VIDEOGRAPHER:  Is that everything?

 7              MR. BHATTI:  I think that's all.

 8              MS. MANNING:  Yes.

 9              VIDEOGRAPHER:  We are off the record at

10   5:55.  That concludes today's deposition.  End

11   Media 5.

12                   (End of proceedings.

13

14

15

16

17

18

19

20

21

22

23

24

25
```



REPORTER'S CERTIFICATION

    I, KELLIE L. ROWBOTHAM, a Certified Shorthand

Reporter in and for the State of Texas, do hereby

certify:

    That the foregoing witness was by me duly sworn;

that the deposition was then taken before me at the

time and place herein set forth; that the testimony

and proceedings were reported stenographically by me

and later transcribed into typewriting under my

direction; that the foregoing is a true record of the

proceedings had.

    That before the conclusion of the deposition,

the witness has requested a review of this transcript

pursuant to Rule 30(e)(1).

    IN WITNESS WHEREOF, I have subscribed my name

this 18th day of March, 2021.


                    _Kellie S. Rowbotham_

                    _____
                    KELLIE L. ROWBOTHAM, Texas CSR 4351
                    Expiration Date: 12/31/21

                    ESQUIRE DEPOSITION SERVICES
                    Firm Registration No. 286
                    1700 Pacific Avenue
                    Suite 1000
                    Dallas, Texas  75201
                    214.257.1436



# Appendix Exhibit A-2

# In the Matter Of:

## SKARIA vs FORTITUDE SYSTEMS INT.

3:20-cv-01203-D

---

## COLIN SKARIA

*March 24, 2021*

---



800.211.DEPO (3376)
*EsquireSolutions.com*

Appx. 51

```
 1                 UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF TEXAS
 2                      DALLAS DIVISION

 3    COLIN SKARIA                 X
                                   X
 4    VS.                          X
                                   X   CASE NO. 3:20-cv-01203-D
 5    FORTITUDE SYSTEMS            X
      INTERNATIONAL LLC, AND       X
 6    ABBOTT LABORATORIES, INC.    X

 7

 8

 9            ORAL AND VIDEOTAPED DEPOSITION OF

10                    COLIN SKARIA

11                   MARCH 24, 2021

12

13

14            ORAL AND VIDEOTAPED DEPOSITION OF COLIN SKARIA,

15    produced as a witness at the instance of the Defendant,

16    and duly sworn remotely pursuant to the Current

17    Emergency Order Regarding the COVID-19 State of

18    Disaster, was taken in the above-styled and numbered

19    cause on the 24th day of March, 2021, from 1:03 p.m. to

20    2:46 p.m., before Vickie J. Coody, CSR in and for the

21    State of Texas, reported by machine shorthand, via Zoom,

22    pursuant to the Texas Rules of Civil Procedure and the

23    provisions stated on the record or attached hereto.

24

25
```



COLIN SKARIA                                        March 24, 2021
SKARIA vs FORTITUDE SYSTEMS INT.                              2

```
 1                 A P P E A R A N C E S

 2    FOR THE PLAINTIFF:

 3          MR. VINCENT J. BHATTI
            Bhatti Law Firm
 4          14785 Preston Road, Suite 550
            Dallas, Texas  75254
 5

 6    FOR THE DEFENDANT FORTITUDE:

 7          MR. ANDREW SOULE
            Fishman Jackson Ronquillo PLLC
 8          13155 Noel Road, Suite 700
            Dallas, Texas  75240
 9
      FOR THE DEFENDANT ABBOTT LABORATORIES:
10
            MS. STEPHANIE JOHNSON MANNING
11          Seyfarth Shaw LLP
            700 Milam, Suite 1400
12          Houston, Texas  77002

13

14    VIDEOGRAPHER:

15          Nicholas Kramer

16

17

18

19

20

21

22

23

24

25
```



800.211.DEPO (3376)
EsquireSolutions.com

Appx. 56

```
1                    I N D E X

2   Witness:  COLIN SKARIA                    PAGE

3   Appearances                                2

4   Index                                      3

5   Direct Examination by Mr. Soule            5

6   Changes & Signature                       65

7   Court Reporter's Certificate              66

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



Appx. 57

1                  THE VIDEOGRAPHER:  Good afternoon.  We are

2    now on the record.  The time is now 1:03 p.m. on March

3    24th, 2021.  This begins the videotaped deposition of

4    Colin Skaria, taken in the matter of Colin Skaria versus

5    Fortitude Systems International LLC and Abbott

6    Laboratories, Inc.  Case number which is

7    3:20-cv-01203-D.

8           My name is Nicholas Kramer.  I'm your remote

9    videographer today.  The court reporter is Vickie Coody.

10   We are representing Esquire Deposition Solutions.

11          Will all counsel please state your name and who

12   you represent?  Afterwards, the court reporter will

13   swear in the witness.

14                  MR. SOULE:  This is Andy Soule for

15   Fortitude.

16                  MS. MANNING:  This is Stephanie Manning

17   for Abbott Laboratories.

18                  MR. BHATTI:  Vincent Bhatti representing

19   Colin Skaria.

20                  THE WITNESS:  And I'm Colin Skaria.

21                  MR. SOULE:  Mr. Skaria is actually frozen

22   on my screen so I'm not sure if he can hear me, but if

23   you can, then you just let me know.

24                  THE WITNESS:  I can

25                  MR. SOULE:  Okay.



1  we looked at last time, I don't know what the number is,

2  but, you know, on -- on there, you know, it probably

3  said they are.  Uh, you know, there must be some wording

4  that that has said that.  That's the only written I -- I

5  can recall.  Uh, there could be emails, there could be

6  any other texts.  You know, I don't -- I don't remember

7  exactly.

8      Q.   Okay.  I -- and I'm not asking about the MSA,

9  Colin.  I'm just asking about communications that would

10 have originated with you, uh, to Fortitude, or even to

11 Abbott, uh, confirming whether or not Fortitude was a

12 preferred vendor.  Have you seen any emails or any

13 correspondence like that?

14     A.   I don't remember.  That's -- that's -- that --

15 that was what I was trying to tell you.

16     Q.   Okay.

17     A.   Yeah.

18     Q.   Now, when you interviewed with, uh, Dennis

19 Ortleb at Abbott, uh, in October of 2018, were you still

20 employed by Inovista?

21     A.   I, um -- I am not sure of the exact date.  Um,

22 I don't have any -- any, uh, exhibits or anything in

23 front of me, but I -- I just -- I'm not so sure if I was

24 employed at that time, or if I, um -- I probably was

25 employed, uh, because I -- I didn't give my resignation



1   until after I got the -- you know, the offer from the

2   company, or the contract, or whatever that document is,

3   the MSA, yeah.

4        Q.   During --

5        A.   I was employed, yes.  Sorry.

6        Q.   During your interview with Dennis at Abbott,

7   did you ask Dennis whether Fortitude was a preferred

8   vendor for Abbott?

9        A.   I am not sure if I had asked that question.  I

10  don't remember.  I don't remember the -- the -- the

11  details of the conversation.  Uh, I do remember we had,

12  you know, other questions asked about my experience and

13  my -- my, you know, um, um, projects, and things like

14  that.

15       Q.   Did you discuss, uh, rate of pay with Dennis,

16  uh, during the interview?

17       A.   Um, I don't remember.  Um, I don't -- I don't

18  remember if I spoke about rates with Dennis.

19       Q.   Did you advise Dennis during your interview of

20  the existence of Magnum Solutions, Inc.?

21       A.   I am not sure.  I don't remember if I spoke

22  about Magnum Solutions, sir.

23       Q.   Did you discuss with Dennis the interest you

24  had in, uh, coming to Abbott as an employee of Magnum

25  Solutions, Inc., a corp-to-corp type of relationship?



COLIN SKARIA                                       March 24, 2021
SKARIA vs FORTITUDE SYSTEMS INT.                        46

 1  would want to see that I have resigned.

 2       A.   Yes, sir.  That's -- that's what I'm -- I'm

 3  still stating.  Uh, Cam did tell me that was a

 4  requirement from the client, which is Abbott, and that,

 5  you know, they wanted to, uh, make sure that I resign

 6  from my job before I took on this project.

 7       Q.   And you then also testified last week that

 8  a -- in a scenario like that, that, uh, was not okay

 9  with you because it would put you at risk.  Do you

10  remember saying that?

11       A.   Yes, I do.

12       Q.   Okay.  And, um, with a -- a request like that

13  that would put you at risk, did you ever go back to Cam

14  and ask Cam, Will you go back to Abbott and ask them to

15  excuse that requirement for me?

16       A.   Um, I don't remember asking anything.  Um, you

17  know, again, um, for me to resign or, uh, you know, put

18  a two-week notice, it is only once there's something

19  concrete at hand.  Uh, at that point, we didn't have

20  anything, uh, you know, in writing or anything of that

21  sort, so I didn't really have -- you know, ask him to go

22  back to Abbott to, uh, waive that requirement, but I did

23  let him know that I was not going to consider that, uh,

24  you know, because I currently have a job, and until I

25  have something in writing, uh, from the, you know,



 1  contract, or whatever, um, I'm not going to, um, you
 2  know, uh, take that step.
 3      Q.   So your testimony is, is that you responded
 4  back to Cam and told him you were not going to resign
 5  until you had a contract, signed contract in place?
 6      A.   Uh, I did let him know that until I have
 7  something written or, um, you know, I have an offer in
 8  my hand, I -- you know, uh, I -- I wouldn't be
 9  comfortable resigning my -- my job.
10      Q.   And you actually testified, uh, last week
11  that, um, your -- your answer was that Fortitude would
12  issue an offer letter, yes, with the terms, not an offer
13  letter, but a contract with terms and conditions in
14  place and that you would need that to resign.  Is that
15  still what you are stating today?
16      A.   Uh, say that again, Andy.  I think I missed
17  you somewhere.
18      Q.   You still are testifying today that, in order
19  for you to have had to resign your job with Inovista,
20  you would have had to have a contract with terms and
21  conditions in place?
22      A.   Yes.
23      Q.   Okay.  Now, um, through your testimony, it's
24  clear that you were uncomfortable with the proposition
25  of resigning a job that you had at Inovista before



 1   know, having to go to a lawyer for a single term or one,

 2   uh, line on a contract that doesn't make sense.  And I,

 3   you know, uh -- my understanding about lawyers are, uh,

 4   you know, they're -- they're real expensive, or you got

 5   to pay a retainer, or, you know, you got to pay them an

 6   hourly rate or something, which could even be more than

 7   what you would make in an hour at the job.  So, uh, it

 8   didn't really seem, uh, necessary to go, or -- or even

 9   sensible to go to, uh, or hire a lawyer to read through,

10   you know, a term or one line that -- that didn't really

11   make sense to me.

12       Q.   As you read through the contract, the Master

13   Services Agreement, was there any one particular section

14   that you did not understand?

15       A.   Um, I don't remember.  Uh, uh, probably, um,

16   arbitration or something is, you know, something that

17   I'm not familiar with and I didn't understand that

18   portion.  Uh, at least from what I recall.  I don't

19   remember all of the -- the pages on the document, but

20   that's one thing I remember.

21       Q.   Okay.  And, uh, you -- when you signed this

22   document, you did so as an officer, uh, of a

23   corporation, Magnum Solutions, Inc., correct?

24       A.   Yes.

25       Q.   And when you did so, um, let's -- if the job



1   had been offered to you, you would have been -- and --

2   and you accepted it, um, once you started at Abbott, you

3   would have been an employee of Magnum Solutions, Inc.,

4   while working in -- as a contractor for Abbott, correct?

5        A.   Uh, that's true.

6        Q.   All right.  Uh, is Magnum Solutions, Inc.,

7   reg -- that's registered in Texas the same Magnum

8   Solutions, Inc., entity that was registered in

9   Pennsylvania?

10       A.   Um, not to my understanding.  Not to my

11  knowledge.  Uh, I -- I think they're -- they're two

12  different entities.  Again, I'm not -- I'm not familiar

13  with the whole corporation, uh, setup and all of that.

14       Q.   But you did it on your own, correct?

15       A.   Um, I don't remember if I set it up myself or

16  if I had a, uh -- a CPA do it for me.

17       Q.   Okay.  If you had a CPA do it for you, what

18  was the CPA's name?

19       A.   Oh, I don't know if I contacted any CPAs at

20  that point.  I have to -- I have to go back and look at

21  the formation documents and see, you know, if I actually

22  had a CPA or not.

23       Q.   Does Magnum Solutions, Inc., have any articles

24  of incorporation?

25       A.   Uh, they should, yes.  They should by the



1    Q.   Well, let's -- let's back up.  Um, who at --

2    who at Fortitude told you it works better for them to

3    present you as an employee of a corporation to Abbott?

4    A.   So I don't remember if it was Lex or Cameron.

5    These are the two people that I had conversations with.

6    Q.   Yeah.  And so, uh, why would it have worked

7    better for them?

8    A.   Uh, they would know.  I wouldn't know.

9    Q.   Yeah.  Um, and are you representing to us

10   today that that's the reason why you formed your

11   corporation?

12   A.   No.  Um, I formed my corporation, uh, because

13   I wanted -- you know, if the opportunity to earn a few

14   more dollars on the hour was there and if they had the

15   wiggle room for that, versus going, uh, on a W-2 -- I

16   think they call that a W-2 -- uh, then, uh, you know,

17   then I wanted to choose, you know, which option gave me

18   a little more, uh, pay on the hour.

19   Q.   Okay.  Um, that's fine.

20        Now, um, let's go, uh, to -- let's fast

21   forward to that time frame within which you were

22   contacting, uh, Fortitude, uh, after the represented

23   start date, um, and you were still not employed by

24   Abbott, okay?

25   A.   Okay.



1    the witness at this point.

2                   MR. BHATTI:  I have no questions.  I'll

3    reserve my questions until the time of trial.

4                   MR. SOULE:  Stephanie, do you?

5                   THE VIDEOGRAPHER:  Stephanie, you're

6    muted.

7                   MS. MANNING:  No further questions.

8                   MR. SOULE:  Colin, thank you for

9    accommodating the, uh, day today.

10                  THE WITNESS:  Thank you.  Thank you, Andy,

11   for your time.  Thank you, Stephanie and Vickie, uh,

12   Nicholas and uh, Vincent.  Appreciate your time.

13                  THE VIDEOGRAPHER:  Before we go off the

14   record, Counsel.  Counsel, can I get your video orders

15   if there are any?

16                  MS. MANNING:  Uh, not right now.

17                  MR. BHATTI:  I'll just take a read and

18   sign.

19                  MR. SOULE:  Can you send me just a PDF,

20   electronic?

21                  MS. MANNING:  Oh, did my assistant not

22   tell Esquire what we needed?  I don't -- I don't ever

23   know.

24                  THE VIDEOGRAPHER:  We're going off the

25   record.  It's 2:46 p.m.



# Appendix Exhibit A-3



colin skaria <colinskaria@gmail.com>

---

## Start Paperwork Forms-Abbott Labs-11/19
2 messages

---

**Lex Gaumer** <lexg@fortitudesys.com>                    Thu, Nov 1, 2018 at 9:26 AM
To: "colinskaria@gmail.com" <colinskaria@gmail.com>
Cc: Admin Team <admins@fortitudesys.com>, Collins Riddell <collins@fortitudesys.com>

Colin,

Congratulations on the job with Abbott Labs! Attached you will find all of the start paperwork. I will also need copies of a **voided check, Corporation Certificate of Insurance,** and **2 forms of ID.** I have CC'd our admin team on this. You will be starting at Abbott Labs **on Monday November 19 @ 9am.**

I will be sending you the appropriate information to complete your drug test.

Thanks!

Lex



Lex Gaumer
Associate Operations Manager, Fortitude Systems

📞 469-249-0700

🌐 www.fortitudesys.com

IMPORTANT: The contents of this email and any attachments are confidential. They are intended for the named recipient(s) only. If you have received this email by mistake, please notify the sender immediately and do not disclose the contents to anyone or make copies thereof.

---

**6 attachments**

📄 **Background Investigation Form - New.pdf**
171K

📄 **Emergency Contact Info.pdf**
220K

📄 **Form W-9 2017.pdf**
128K

📄 **ADP Direct Deposit SIGN UP Form.pdf**
438K

📄 **Confidentiality Agreement-Colin Skaria.pdf**

 **Master Services Agreement-Colin Skaria.pdf**
244K

---

**colin skaria** <colinskaria@gmail.com>                                    Fri, Nov 2, 2018 at 1:22 PM
To: lexg@fortitudesys.com

Hi Lex,

Per our conversation yesterday and text this AM, attached please find the requested documents signed for your review and signature.

Note: I will be scheduling the drug test for early next week (Most likely Monday if available). Also, I have only included the pages that require signatures.

Thank you very much for your time and patience. Please let me know if you have any questions or concerns. Have a great day and a wonderful weekend!

best,
Colin Skaria
267-844-8676
[Quoted text hidden]

---

**13 attachments**


**Background_signed_Colin.jpg**
491K


**Confidentiality_Signed_Colin.jpg**
340K


**Master Services Agreement_Signed_Colin_1.jpg**
228K


**Master Services Agreement_Signed_Colin_2.jpg**
252K

Skaria 0001A    Appx. 69





**Master Services Agreement_Signed_Colin_3.jpg**
541K



**image001.png**
7K

**image002.png**
2K

**image003.png**
2K

**image004.png**
2K

**image003.png**
2K

**image002.png**
2K



**image001.png**
7K

**image004.png**
2K

# Appendix Exhibit A-4



# FORTITUDE

### EXCLUSIVE AGENCY AGREEMENT
### *For use on positions referred by Fortitude Systems*

In consideration of your time, effort and expense in interviewing me for a position with **Abbott Laboratories**, specifically identified as a **Business Analyst**, I give you my exclusive authorization to submit me as a candidate for such assignment.

Further, I have not and will not permit or authorize any other company or individual to submit me as a candidate for the above referenced position.

I understand this is not an offer of, or a contract of, employment. If you decide to extend an offer of assignment, I understand such assignment will be offered in writing by one of your duly authorized representatives.

Candidate Name: **Colin Skaria**

Submitting Agency:  Fortitude Systems

Date:  _____
           (Completed by candidate)

Time:  _____
           (Completed by candidate)

Signature:  _____
                 (Completed by candidate)

# Appendix Exhibit A-5

 Gmail

**colin skaria <colinskaria@gmail.com>**

## FW: Resignation - 2 week notice
1 message

**Shine Gopalakrishnan** <sgopalakrishnan@innovista-health.com>                Sun, Aug 23, 2020 at 10:35 PM
To: "colinskaria@gmail.com" <colinskaria@gmail.com>

Here you go, Colin.


Thank You,

Shine Gopalakrishnan

Director of Analytics and Technology Implementation

O: (281) 377-5606 Ext: 6001

C: (713) 492-1771

Innovista Health Solutions



---

**From:** Colin Skaria
**Sent:** Sunday, November 4, 2018 11:00 PM
**To:** Shine Gopalakrishnan <sgopalakrishnan@innovista-health.com>; Selase Dow <sdow@innovista-health.com>
**Subject:** Resignation - 2 week notice


Dear Shine and Selase,


Hope you had a great weekend. I'm emailing to let you know of my resignation from Innovista health. I regret to inform you, that I am resigning from my position as Market Data Analyst, to pursue another promising and exciting opportunity. Please consider this email my 2 week notice. My last day will be Friday, 11/16/2018.


I am happy to say that, I had a great time and experience at Innovista health. I learned a great deal about health care management and the health care industry. I

will always look back on my time here fondly. Above all, I couldn't ask for a better team to work with. Thanks for being such great co-workers and friends, making me feel comfortable, going above and beyond your responsibilities to train and make me comfortable in my role. I cannot thank you enough and want to take this time to convey my sincere thanks and appreciation, for the opportunity you extended me within your team and the organization, for all the help over the past 5 months in my new role as the Dallas Market analyst and for being kind & considerate in allowing me the flexibility to work from home.  It was a pleasure working with you both, Dr. Walton, Shilpa and the rest of the Innovista and Genesis teams.

I regret that my current situation requires that I make this difficult decision now for my career and family. I sincerely apologize for any inconvenience my resignation may cause you and the rest of the Innovista & Genesis teams. Thank you very much for your time and understanding in this matter.

Per our discussion, we have agreed to do a payout option for any unused/accrued PTO time that I have remaining. I will try my best to complete all the pending reporting requirements and transition activities including documentation of processes and reports before my last day at Innovista.

Thanks once again for your time, understanding and support. I wish you, Innovista and Genesis all the best in your endeavors and hope to cross paths with you in the future. Have a great day and blessed week ahead!

Best,

Colin Skaria

*Market Data Analyst — North Texas*



cskaria@innovista-health.com

Cell — (267) 844-8676

***The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this message in error, please contact the sender and delete the material from any computer.***

Skaria 0001A
Appx. 75

# Appendix Exhibit A-6

 **colin skaria <colinskaria@gmail.com>**

---

## Signed Fortitude Documents

1 message

---

**Lex Gaumer** <lexg@fortitudesys.com>                      Thu, Nov 8, 2018 at 10:56 AM
To: "colinskaria@gmail.com" <colinskaria@gmail.com>

Hi Colin,

Attached are the signed Masters agreement documents. Please let me know if you have any other questions, concerns, or other documents you want us to sign.

Best,

Lex



Lex Gaumer
Associate Operations Manager, Fortitude Systems

📞 469-249-0700

🌐 www.fortitudesys.com

IMPORTANT: The contents of this email and any attachments are confidential. They are intended for the named recipient(s) only. If you have received this email by mistake, please notify the sender immediately and do not disclose the contents to anyone or make copies thereof.

---

 **CCE11062018.pdf**
318K

# Appendix Exhibit A-7



# FORTITUDE

## MASTER SERVICES AGREEMENT (B2B)

**1.     Parties.**  This Agreement is entered into between Fortitude International LLC, DBA Fortitude Systems ("Fortitude") and [Abbott Labs] ("the Company").

**2.     Services.**  Fortitude provides staffing services and related services.  Fortitude is engaging the Company to fill staffing needs of Fortitude's Clients ("Clients").  The Company shall supply temporary workers ("Assigned Workers") to the Client to complete projects that support Client's staffing needs.  Fortitude's Clients are third party beneficiaries of this Agreement.  This Agreement is a Master Services Agreement that may apply to multiple engagements.  The specific engagements will be set forth in the Work Assignment and Fee Schedule.  This Agreement does not

**3.     Fees.**  In consideration for the services by the Company, Fortitude shall pay the Company the fees listed in the attached Exhibit A.  Any changes in the fees must be made in writing and signed by an authorized representative of the Company and Fortitude.  This Agreement does not guarantee any minimum amount of work or payment.  No payment will be made for hours not actually worked, whether on account of the Client's request or otherwise.  If an assignment is cancelled by a Client or Fortitude, Fortitude shall pay the Company for hours worked up to the time Company is notified of the cancellation of the assignment.

**4.     Invoices.**  The Company will invoice Fortitude on a weekly basis.  All invoices are due and payable ten (10) business days from Fortitude receiving payment from the Client.

**5.     Company's Responsibilities.**

    **A.     Employment Status.**  Company, and not Fortitude or Client, is the employer of Assigned Workers.  Company will ensure all Assigned Workers are W-2 employees of Company for all purposes, whether common law or statutory, including but not limited to federal, state and local tax withholding, reporting and remitting obligations, minimum wage, overtime, paid sick leave and other employee compensation or benefits laws, worker's compensation laws, and discrimination and harassment laws.

    **B.     Wage and Hour.**  Company agrees that it will pay Assigned Workers on a W-2 basis and in compliance with all applicable federal, state and local wage and hour laws, including but not limited to minimum wage and overtime requirements, and any other wage payment, reimbursement, recordkeeping, or similar laws under applicable federal, state or local law. Company is solely responsible for determining if any Assigned Worker is eligible for any overtime.

    Company shall be the W-2 employer of the Assigned Workers for purposes of the withholding and payment of employment taxes.  Company shall be exclusively responsible for and will comply with applicable laws governing the reporting and payment of payroll taxes attributable to wages paid to Assigned Workers, including but

Skaria 0000A0 Appx. 79

not limited to: (i) federal, state, and local income tax withholding; (ii) federal and state unemployment tax ("FUTA" and "SUI"); (iii) contributions required by the Federal Insurance Contribution Act ("FICA") and (iv) healthcare insurance, benefits and related reporting as required under the Patient Protection and Affordable Care Act (the "Affordable Care Act").

Upon the Client's or Fortitude's request, Company will present the Client or Fortitude proof that Assigned Workers are W-2 employees of Company.  If Company fails to provide such proof, Fortitude shall have the right to withhold payment under this Agreement due for services provided by such Assigned Worker and/or terminate this Agreement.

**C.      Sick Leave.**  For Assigned Workers performing services in state, county, or local jurisdictions that mandate minimum levels of paid sick time be made available to employees, the Company agrees to provide sick days as required under such statutes. It is the sole and exclusive responsibility of the Company to track paid sick leave for Assigned Workers and meeting other requirements of paid sick leave laws.   The Company agrees to fully defend and indemnify Fortitude and the Client for any allegations that are asserted by any Company employee that either the Company, Fortitude, or the Client did not comply with these paid sick leave laws.

**D.      Benefits.**  The parties acknowledge and agree that Company and not Fortitude or the Client is responsible for the provision of all employee benefits for Assigned Workers, including without limitation benefits such as meals, parking, transportation, paid time off, holidays, retirement benefits, fringe benefits or perks. Assigned Workers shall not be eligible to enroll in or participate in Fortitude's or the Client's employee benefits programs.  Company shall be solely responsible for providing any benefits required by applicable local, state and federal laws, statutes, regulations and ordinances governing employment.

**E.      Worker Verification.**  The Company will verify and ensure that Assigned Workers furnished to the Client meet all requirements to work, and have all necessary permits, certifications, licenses, and/or documents, including but not limited to any forms required by the U.S. Citizenship and Immigration Services to be timely completed and kept by the Company, in accordance with federal and state laws.  No Company employee shall be supplied to the Client without a complete employment application on file with the Company.  The Company will provide Fortitude and/or the Client with a written confirmation of completion of all reference checks, background checks, and drug screens prior to an assigned employee's starting date at the Client.  Upon request, all pre-screening reports will be made immediately available to Fortitude and/or the Client for inspection (to review, not copy).

**F.      Licensing and Permits.**  The Company is responsible for ensuring the Assigned Worker maintains valid and in force at all times all licenses or permits or similar requirements to complete the assignment.

**G.      Warranty.**  Company represents and warrants that work performed by Assigned Workers, (i) will be performed in a timely, professional, and workmanlike manner, in compliance with applicable industry standards and in accordance with the requirements of this Agreement; (ii) will comply with applicable laws, rules, or regulations; (iii) will not violate or infringe up on the rights of third parties, including contractual,

Skaria 0000Appx. 80

employment, trade secrets, proprietary information, and non-disclosure rights, or any trademark, copyright, or patent rights; (iv) will comply with this Agreement; and (v) to the extent consisting of deliverables, will be technically correct and based upon Client furnished criteria and upon any other information or documents mutually agreed upon by the parties.

**H.   Legal Compliance.** Company acknowledges that Fortitude and/or the Client must comply with regulatory requirements imposed upon them under federal, state and local laws. Company agrees that it will comply with all federal, state and local labor and employment laws applicable to Assigned Workers performing services under this Agreement, including, without limitation, the National Labor Relations Act; Immigration Reform and Control Act of 1986; the Internal Revenue Code ("Code"); the Employee Retirement Income Security Act ("ERISA"); the Health Insurance Portability and Accountability Act ("HIPAA"); the Family Medical Leave Act ("FMLA"); Title VII of the Civil Rights Act of 1964; the Americans with Disabilities Act ("ADA"); Age Discrimination in Employment Act ("ADEA"); the Older Workers Benefit Protection Act ("OWBPA"); the Equal Pay Act; the Fair Labor Standards Act; the Consolidated Omnibus Budget Reconciliation Act ("COBRA"); the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"); the Affordable Care Act, and any related recordkeeping requirements.   Company agrees to apply nondiscriminatory standards of employment opportunity, and to comply in full with any and all requirements of federal law, regarding equal employment opportunity.

**I.   Human Resources.** Company is responsible for all human resource functions for Assigned Workers, including recruiting, hiring, assigning, scheduling, employment-based counseling, discipline, termination, salary determination, performance evaluations, and making legally-required employment law disclosures (including wage-hour posters). Company shall control the Assigned Workers' hours and assignments.

**J.   Workers' Compensation and Unemployment.** Company is responsible for providing workers' compensation benefits or coverage for Assigned Workers in amounts at least equal to what is required by law.  Company is responsible for unemployment compensation for Assigned Workers.

**K.   Policies.** The Company is responsible for ensuring that each Assigned Worker has been provided with and/or received any and all policies, certifications, and training necessary to perform the work for which the worker is assigned.  To the extent possible, the Company must conduct the necessary orientation and trainings for each worker prior to his or her start date at the Client, including (i) review of the Client's general policies and procedures (e.g., policies on working hours, break and meal times, conduct, attendance and tardiness, etc.), (ii) review of any safety videos and related safety guides provided by the Client, as applicable, and (iii) review of the Client's safety requirements. Prior to commencing any assignment, the Company must execute a checklist that acknowledges its employee's satisfactory completion of this orientation and training. The Company will advise all Assigned Workers of their obligation to comply with all of the Company's and Client's safety, anti-harassment, anti-discrimination and anti-retaliation, and other policies applicable to the work performed while assigned to the Client; provide each Assigned Worker with a copy of the policies; and obtain a signed acknowledgement from each employee of receipt and review of the policies and agreement to comply with the policies.  All Assigned Workers, like all vendors performing services for the Client on site, are expected to comply with the Client's

B2B MSA

Skaria 0000Appx. 81

policies. Time spent by the Assigned Workers to attend such orientation and training may be billed by Company to Fortitude as compensable time under this Agreement.

**L.     Health and Safety.**  Assigned Workers are responsible for immediately reporting all accidents, injuries, or other health and safety issues to the Company, which shall promptly alert the Client verbally and in writing. Assigned Workers must also report any and all accidents in accordance with federal and state laws and regulations. Any accident, injury or health and safety issue that involves an emergency or that could pose a continuing hazard in the workplace must be reported to the Client by the Company's employee(s) immediately.

**M.     Tools and Equipment.**  Company shall provide any special materials, tools and equipment that are needed by the Assigned Worker in the assignment with the Client, unless otherwise agreed to in writing.

**N.     Insurance.**  The Company shall maintain insurance naming Client as an Additional Named Insured party as set forth below. Upon request, the Company shall furnish to Fortitude and/or the Client a copy of such insurance policy and written certificates of insurance.

> **a.**     Commercial General Liability insurance coverage for Client, its agents and employees, including bodily injury, personal injury, contractual liability, and broad form property damage, with at least $5,000,000 combined single limit per occurrence; and to maintain Errors and Omissions coverage in the Commercial General Liability policy or otherwise;

> **b.**     Automobile Liability Insurance with a limit of at least $1,000,000 per occurrence;

> **c.**     Workers' Compensation statutory coverage as required by the laws of the jurisdiction in which the services are performed, with a limit of at least $1,000,000 per occurrence, or greater if required by statute, that covers each Company Assigned Worker who is supplied to the Client.

> **d.**     Employment Practices Liability Insurance ("EPLI") coverage with a $1,000,000 combined single limit per occurrence;

> **e.**     Umbrella coverage insurance with a $5,000,000 combined single limit per occurrence;

> **f.**     Commercial Blanket Bond covering each Contract Worker with limits of not less than $500,000 (for any workers handling cash or with computer access);

> **g.**     Group Health Care Insurance in compliance with the Affordable Care Act that meets the minimum essential coverage and affordability requirements.

**O.  Affordable Care Act.**  The Company agrees to comply with all requirements of the Affordable Care Act for the Assigned Workers. Specifically, the Company agrees to offer group health insurance that is compliant with the Affordable Care Act, including the employer shared responsibility provisions relating to the offer of "minimum essential

Skaria 0000 **Appx. 82**

coverage" to "full-time" employees and the applicable employer information reporting provisions.

**P. Confidential Information; Return of Property.** All confidential information of the Client known or obtained by the Company, including the Assigned Workers, will be kept confidential, will be used only in connection with the services performed under this Agreement, and will not be disclosed to any third party unless the information is required to be disclosed by law or judicial order or has been previously disclosed publicly. "Confidential Information" means trade secrets and nonpublic proprietary information furnished by the Client, including pricing information, customer lists, technical information or software, analyses or other nonpublic proprietary documents prepared or owned by the Client. The Company will comply with security and data protection requirements and best practices, including storage, access, transmittal, and encryption The Company will also ensure that any badges, access cards and other material of the Client are promptly returned to the Client for each assigned worker upon termination or completion of an assignment at the Client, if not previously obtained by the Client.

**Q. Non-Solicitation; Non-Compete.** The Company agrees not to employ, solicit the employment of, or aid any third party to solicit the employment of any employee of the Client in any capacity during or for a period of one (1) years following termination of this Agreement. Client and Company may agree to waive this obligation in writing on a case by case basis. To the extent permitted by law, The Company agrees not to permit any Assigned Worker to work for the Client except under this Agreement during the course of this Agreement and for one (1) year following its termination.

**R. Conflicts of Interest.** Any prospective Assigned Worker must be approved by the Client, confirming there are no conflicts or other concerns with the placement, prior to the commencement of the assignment if the individual is (i) former employee of the Client, (ii) Company employee previously assigned to the Client, or (iii) relative of a current employee of the Client. The Company agrees to expressly notify Fortitude and/or the Client, in advance, whenever a prospective worker falls in to one or more of these categories. The Company further warrants its assignment of Assigned Workers will not violate any existing contractual or other legal obligation with a third party.

**S. Publicity.** Company shall not use the name or proprietary marks of Fortitude or the Client, in any press release, sales or marketing publication or correspondence, advertisement, customer or reference list, or other similar communication without Fortitude or Client's prior written consent.

**T. Worker Acknowledgement.** Prior to allowing an Assigned Worker to perform any services for Client, Company shall require the Assigned Worker to sign the Worker Acknowledgment Agreement (attached hereto as Exhibit B) informing the Assigned Worker, among other things, that he or she is an employee of Company, and that he or she is not an employee of Fortitude or the Client and is not entitled to any benefits or compensation from Fortitude or the Client.

**U. Compliance with Fortitude's Contract with Client.** The Company shall comply with all terms of Fortitude's contract with the Client, and shall not take any action to breach or cause Fortitude to breach Fortitude's contract with Client.

B2B MSA

Skaria 0000Appx. 83

**V. Federal Contractor Requirements.** Company will not discriminate on the basis of race, national origin, religion, age, color, sex, disability or veteran's status, or any other characteristic protected by local, state or federal laws, rules or regulations. Company will make good faith efforts to recruit, qualified minorities, females, individuals with disabilities and veterans as well as all qualified applicants regardless of their race, sex, age, religion, marital status, veterans status, ancestry, national origin, citizenship, disability or any other characteristic protected by law. Company will comply with the following:

- Executive Order 11246 (and its implementing regulations at 41 C.F.R. Part 60);

- The Vietnam Era Veterans Readjustment Assistance Act of 1974, as amended (and its implementing regulations at 41 C.F.R. 60-250 and 41 C.F.R. 60-300); and

- Section 503 of the Rehabilitation Act of 1973, as amended (and its implementing regulations at 41 C.F.R. 60-741); and,

- Executive Order 13496 (and its implementing regulations at 29 C.F.R. Part 471, Appendix A to Subpart A).

The implementing rules and regulations of the Department of Labor's Office of Federal Contract Compliance Programs are incorporated herein by specific reference.

Company shall abide by the requirements of 41 CFR §§ 60-1.4(a), 60-300.5(a) and 60-741.5(a). These regulations prohibit discrimination against qualified individuals based on their status as protected veterans or individuals with disabilities, and prohibit discrimination against all individuals based on their race, color, religion, sex, or national origin. Moreover, these regulations require that covered prime contractors and subcontractors take affirmative action to employ and advance in employment individuals without regard to race, color, religion, sex, national origin, protected veteran status or disability.

Company agrees to provide Fortitude and/or Client with copies upon request of any and all written Equal Opportunity and Affirmative Action Policy reports and statements regarding Company as well as Federal Equal Employment Opportunity (EEO) information pertaining to the assigned workers. Further, Company will maintain race, gender, veteran status and disability information for every Applicant (as defined below) that it considers when it refers and/or assigns Assigned Workers to Client. An "Applicant" is any individual that: (1) Company considers for Assignments and/or placement with Client; (2) has the basic qualifications (as that term is defined in the Office of Federal Contract Compliance Programs' (OFCCP's) Internet Applicant definition (See 70 Fed. Reg. 58962 (Oct. 7, 2005)) for the Client position; and (3) who at no point indicates that he/she is not interested in the position.

For each position that Company refers assigned workers to Client, Company will contemporaneously provide an anonymous summary chart (no names) listing the race, gender, veteran status and disability status of all qualified Applicants considered by Company for the job. This should be accomplished through a voluntary form all Applicants can complete. All qualified Applicants considered by Company will be

Skaria 0000AAppx. 84

included on this chart, regardless of whether Company referred the Applicant's resume to Client. Company shall maintain all such records for three years.

Without limiting the Indemnity provision in this Staffing Agreement, should Company fail to maintain this information or should the Company's selection process run afoul of Executive Order 11246, its implementing regulations (41 C.F.R. Parts 60-1 and 60-2), the Uniform Guidelines on Employee Selection Procedures (41 C.F.R. Part 60-3), or Title VII, Company will indemnify Client from any liabilities (including back pay, front pay, interest, other damages, and liabilities related to any other remedies, such as prospective hiring) that may result from either an adjudicated or negotiated resolution to any Notice of Violations or Pre-Determination Notice issued by the OFCCP.

If applicable, Company shall also comply with San Francisco's Fair Chance Hiring Ordinance. Company will commit to eliminating negative impacts against individuals who have been incarcerated or otherwise have criminal convictions and to assist with successful reintegration into the community. Self-disclosure of criminal history information will not occur until the last steps of the selection process when background checks are performed.

6.  **Fortitude Responsibilities.**

    A.  Fortitude agrees to pay Company the fees invoices as set forth in this Agreement.

    B.  Fortitude shall furnish the contract between Fortitude and the Client, which shall require the Client to provide Assigned Workers a suitable place of work that complies with applicable federal, state, and local health and safety laws.

    C.  Fortitude shall furnish the contract between Fortitude and the Client, which shall require the Client to agree to not ask Assigned Workers to perform services "off the clock," and to designate a member of its staff who will be authorized to sign time slips presented to it by Assigned Workers in order for Company to accurately monitor and record the workers' compensable working time.

7.  **Independent Contractor Status.** The Company will at all times relevant herein and in the performance of this Agreement, be deemed an independent contractor, having an existence separate and distinct from Fortitude and the Client, and conducting business on its own. Nothing contained in this Agreement shall be construed to create an agency or joint employer relationship between Fortitude, the Client and/or the Company. Neither the Company nor any Company employee shall in any way be, nor be deemed to be treated or construed, as an employee or agent of Fortitude or the Client. The Company retains full control over the employment status, compensation, and discharge of all Assigned Workers performing work for the Client. The Company will be fully responsible for Assigned Workers, including hiring, discipline, and termination, while performing the obligations and services under the terms of this Agreement.

8.  **Non-Exclusivity.** This Agreement is not exclusive. Either party may contract with another party to obtain or provide services similar to the Services that are the subject of this Agreement. However, the Company shall not bypass Fortitude and contract directly with the Client for a period of two (2) years after the last day an Assigned Worker provides services to the Client.

Skaria 0000Appx. 85

**9.     Subcontractor, Successors and Assigns.**   Company may subcontract the services required under this Agreement only with the signed written approval of Fortitude and the Client. All subcontractors must comply with the terms of this Agreement.  Subcontracting does not absolve Company of liability under this Agreement.   Company is responsible for its responsibilities under this Agreement even when Company subcontracts or assigns the Services. This Agreement shall be binding upon, and shall inure to the benefit of, Fortitude, the Client and the Company hereto and their respective successors and permitted subcontractors or assigns.

**10.     Indemnity.**  The Company shall be responsible for, and shall indemnify , defend and/or hold Fortitude and the Client, and their respective parent, subsidiaries and affiliated companies, officers, directors, representatives, affiliates, workers, agents, and employees (hereinafter "Releases") harmless, from and against any and all liabilities, damages, losses, expenses, claims, demands, suits, settlement payments, penalties, fines, interest, judgments of any kind, however arising, including costs, attorneys' fees and expenses incident thereto, which may be suffered by, accrue against, be charged to or recoverable from any of the Releases, by reason of:  (a) any failure of or breach by the Company or any of its employees (including Assigned Workers) to comply with any of the terms and conditions of this Agreement or Fortitude's contract with its Client, (b) acts or omissions of the Company, including any of the Company's employees (including Assigned Workers), related to any claims for bodily injury to or death of persons, or loss of, damage to or destruction of property arising out of or related to the performance by the Company, including any of the Company's employees (including Assigned Workers), under this Agreement; (c) any demand, claim, charge, suit or accusation of any kind of direct or vicarious liability based on conduct of any kind allegedly imputed to Fortitude or the Client or any of Releases as the "employer" or "joint employer" of any of the Assigned Workers concerning any claim brought under any federal, state, or local statute, law, regulation, or ordinance, including, but not limited to, Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act, the Age Discrimination in Employment Act, 42 U.S.C. sections 1981 and/or 1983, the Equal Pay Act of 1963, the Occupational Safety and Health Act, the Fair Credit Reporting Act, the Consolidated Omnibus Budget Reconciliation Act, the Family and Medical Leave Act, the Fair Labor Standards Act, the Employee Retirement Income Security Act, the Patient Protection and Affordable Care Act,  the U.S. Constitution, all similar state and local statutory employment claims, and any common law claims including, but not limited to, claims for breach of contract, breach of the implied covenant of good faith and fair dealing, violation of public policy, whistle blowing,   negligent hiring, supervision and/or retention, assault, battery, defamation, false imprisonment, and tortious interference; (d) any liability for premiums, contributions or taxes payable under any workers' compensation, unemployment compensation, benefit, or tax withholding laws; (e) the negligence, willful misconduct, or violation of law by any of the Company's employees (including Assigned Workers) in the performance of the obligations under this Agreement; and/or (f) any claim or allegation that any confidential information obtained by the assigned workers infringes or violates any trademark, patent, copyright, trade secret, or other intellectual property or proprietary right of any third party.  The Company agrees to provide Fortitude and/or the Client with notification within ten (10) days of either the discovery of the occurrence upon which the claim may be based or learning of the claim, whichever occurs first. Fortitude and the Client and Releases shall cooperate with the Company and its counsel in the defense of any such claim or lawsuit at the Company's expense. This paragraph shall survive any termination of this Agreement.

Fortitude shall defend, hold harmless, and indemnify Company against any legal liability (including legal defense attorneys' fees and costs) resulting from, arising out of or related to any violation of this Agreement or any violation of federal, state, or local law arising out of any actions of Fortitude or its employees.

Skaria 0000**Appx. 86**

11.     **Dispute Resolution, Arbitration, Attorneys' Fees.**  Any and all disputes or claims arising out of or relating to the Company or Fortitude's rights, obligations, or performance of services contracted for under this Agreement, or the validity, interpretation, enforceability, or breach thereof, which is not settled by agreement between Fortitude and the Company, shall be submitted to binding arbitration in accordance with the Commercial Rules of Arbitration of the American Arbitration Association then in effect or any successor thereto.  This Agreement shall be governed by the Laws of the District of Columbia, without reference to its choice of law principles.  The District of Columbia shall be the venue for any dispute arising between the parties concerning this agreement.  The arbitrator shall be selected by mutual agreement. The arbitrator's decision and/or award shall be final and binding upon Fortitude and the Company.  To the extent that a dispute is determined not to be arbitrable under this Section, the parties consent to the jurisdiction of the courts located in The District of Columbia. If any proceeding, including an arbitration action, is brought to enforce or interpret the provisions of this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees and costs from the other party.

12.     **Termination.**  This Agreement shall take effect upon execution by both Fortitude and the Company.  This Agreement can be canceled by written notification from Fortitude at any time with or without cause.  The Company shall provide Fortitude with 10 business days' notice of cancellation, but may cancel without notice for a material breach of this contract.  Fees are owed based on assignments and hours actually worked.  Nothing in this Agreement entitles Company to payment for hours not actually worked, regardless of whether Fortitude, Company, or Client cancels the assignment.

13.     **Notices.**  Any notices required or permitted to be given under this Agreement shall be in writing and shall be served personally, delivered by courier or sent by United States Certified Mail, postage prepaid with a return receipt requested, addressed to the other party as follows:

Fortitude, Inc.              Fortitude International, LLC
                             Attention: Adam Kattoua
                             3120 Fairview Park Drive Ste. 520
                             Falls Church, VA 22042

Consulting Company:   [Magnum Solutions Inc.]
                             [3165 Brianna Drive Frisco, TX 75033]

14.     **Entire Agreement.**  This Agreement constitutes the entire agreement between Fortitude and the Company respecting the subject matter hereof and supersedes all prior agreements and any representations whether oral or written.  Fortitude and the Company must agree in writing to any modification of this Agreement.

15.     **Counterparts.**  This Agreement may be executed in several counterparts, each of which will be deemed an original, and all of which taken together will constitute one single agreement between the parties with the same effect as if all the signatures were upon the same instrument. A facsimile, scanned, or electronic signature shall be as legally effective as an original signature.

16.     **Survival, Severability, Non-Waiver.**  The rights and obligations set forth hereunder survive termination.  If any provision of this Agreement is determined to be unenforceable or prohibited by applicable law, such provision shall be ineffective only to the extent of such unenforceability or prohibition, without invalidating the remaining provisions of this Agreement.  The failure or delay

Skaria 0000Appx. 87

of either party to enforce at any time any provision of this Agreement shall not constitute a waiver of such party's right thereafter to enforce each and every provision of this Agreement.

**By signing below, the undersigned acknowledge that they have read, understand, and agree to all of the terms and conditions stated herein and have all necessary authorization and power to execute this Agreement as the binding obligation of their respective companies.**

Fortitude International LLC                    [Magnum Solutions Inc.]

| By: (Print Name) Ben Khoury | | By: (Print Name) Colin Skaria | |
| Signature: | | Signature | |
| Title: Manager of Business Ops | Date: 11/5/2018 | Title: President | Date: 11/01/2018 |

Skaria 0000A **Appx. 88**

## Exhibit A:  Work Assignment and Fee Schedule

This Work Assignment is pursuant to the Staffing Agreement between **Fortitude International, LLC DBA Fortitude Systems** ("Fortitude") and **[COMPANY NAM]** ("the Company") (the "Agreement").  In the event of any inconsistency or conflict between this Work Assignment and the Agreement, the terms of the Agreement shall control.

Date of Request: 11/1/2018 with start date of 11/19/2018

Description of Services: Business Analyst

Location of Services:  Plano, TX

Hourly Bill Rate: 65/hr C2C

**Fortitude International LLC**                                      [Magnum Solutions Inc.]

Signature: _____          Signature: _____

Name:  Ben Khoury                                         Name:   Colin Skaria

Title:  Manager of Business Operations        Title:   President

Date:  11/5/2018                                            Date:   11/01/2018

Skaria 00007

Appx. 89

## Exhibit B:  Worker Acknowledgment and Confidentiality Agreement

This Worker Acknowledgment and Confidentiality Agreement (the "Agreement") is made in consideration of my assignment by [Magnum Solutions Inc.] ("Company"), which may assign me to provide temporary services to [Abbott Labs] ("Client").

### Section 1.        Nature of Relationship

I acknowledge that I am an employee of Company and not Client, and the Company has assigned me to provide temporary services to the Client. Consequently, the Company is the sole entity responsible for providing me any earned compensation and benefits. I will not be eligible to receive any kind of compensation or benefits from the Client. I will not be eligible to participate in any of the Client's employee-benefit plans, fringe-benefits plan, or any employee-bonus plan while I am an employee of the Company. I acknowledge I have received information from Company regarding terms of eligibility and ability to enroll in qualifying coverage under the Patient Protection and Affordable Care Act (the "Affordable Care Act").

### Section 2.        Confidentiality and Non-Disclosure; Defend Trade Secrets Act

The Client's non-public information and materials including, but not limited to: discoveries, inventions (including but not limited to improvements or modifications) or literary or other works related to the work performed under this Agreement or suggested by matters disclosed in conjunction with my assignment, whether or not patentable, copyrightable or otherwise subject to registration or protection which are made or conceived by me, solely or jointly with others, are considered proprietary and confidential ("Confidential Information"). This Confidential Information that I may be or have been exposed to may belong to the Company or to the Client, or their affiliates, employees, customers or vendors. I will hold all Confidential Information obtained by reason of my service to the Company and the Client in strict confidence, and will not copy, disclose or use it except as authorized by the Company and for the Company's benefit and will keep such Confidential Information in a secure location. Moreover, I agree to not improperly solicit Confidential Information. If anyone tries to compel me to disclose any Confidential Information, by subpoena or otherwise, I will immediately notify the Company's legal counsel so that the Company may take any action necessary to protect its interests or the interests of the Client. I hereby acknowledge that such disclosure, if unauthorized, will cause irreparable injury to the Company and/or the Client. My agreement to protect Confidential Information will apply both while I am providing services to the Client and after my placement at the Client ends, regardless of the reason it ends. Upon the Company or the Client's request, or upon termination of my assignment to Client, I will promptly return to the Company or Client all Confidential Information, together with all copies and extracts.

Nothing herein prohibits me from reporting an event that I reasonably and in good faith believe is a violation of law to the relevant law-enforcement agency (such as the Securities and Exchange Commission, Equal Employment Opportunity Commission, or Department of Labor), or from cooperating in an investigation conducted by such a government agency. I am hereby provided notice that under the 2016 Defend Trade Secrets Act (DTSA): (1) no individual will be held criminally or civilly liable under Federal or State trade secret law for the disclosure of a trade secret (as defined under the DTSA) that: (A) is made in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and made solely for the purpose of reporting or investigating a suspected violation of law; or, (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal so that it is not made public; and, (2) an individual who pursues a lawsuit for retaliation by an employer

Skaria 0000Appx. 90

for reporting a suspected violation of the law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual files any document containing the trade secret under seal, and does not disclose the trade secret, except as permitted by court order.

**Section 3.**      **Materials and Data Protection**

I will safeguard and return to the Company or the Client, when my placement with the Client ends, or sooner if the Company requests, all documents, materials, tools, electronic media, keys, access cards, and other property in my care, custody or control relating to my services for the Client, including without limitation any tangible or electronic documents that contain the Company's or the Client's Confidential Information. I agree to protect, handle, manage, store, transmit and discard any Confidential Information accessible to me, regardless of its format, in a manner that ensures that the Confidential Information is: (1) held in the strictest confidence; and (2) inaccessible to anyone that is not an authorized employee or representative of the Company.

**Section 4.**      **Job-Related Injury or Illness**

Because the Company is my employer, I acknowledge that I am required to report all job-related injuries or illnesses to the Company. I will also promptly report any job-related injury or illness to Client.

**Section 5.**      **Policies**

Even though the Company is my employer, I agree to comply with all of the Company's and the Client's rules of conduct, including but not limited to: anti-harassment, anti-discrimination and anti-retaliation policies, safety policies, drug and alcohol policies, other workplace policies and codes of business conduct, which policies and orientation will be timely provided by the Company. I understand these policies apply to all on-site vendors.

**Section 6.**      **Background Screening and Reference Check**

I acknowledge that the Company performed a Background Check on me that may include an investigation for criminal records, verification of my education, employment history, confirmation of any professional licenses, and checking of employment and personal references. I authorize the Company to release information concerning this Background check to the Client or any party arranging for my assignment with Client, including but not limited to an inspection of the information gathered about me and any oral or written reports.

**Section 7.**      **Survival**

The obligations created by this Agreement survive the termination of my candidacy for placement, my placement at the Client and my employment with the Company. This Agreement is binding on me, my heirs, executors, personal representatives and legal successors, and is intended to benefit the Company and its successors and assigns.

**Section 8.**      **Arbitration**

A.      **Arbitration**. This Agreement is governed by the Federal Arbitration Act (9 U.S.C. §§ 1 et seq.). Except as is otherwise provided, this Agreement applies to any dispute arising out of or related to Employee's (sometimes "you" or "your") employment with Company,

Skaria 0000 **Appx. 91**

as defined in this Worker Acknowledgment, or related to any claims against its customers to which I am assigned, or their agents, employees, affiliates, successors, subsidiaries, assigns or parent companies or termination of employment regardless of its date of accrual and survives after the employment relationship terminates.

> **Except as it otherwise provides, this Agreement is intended to apply to the resolution of disputes that otherwise would be resolved in a court of law or before a forum other than arbitration. Except as otherwise stated in this Agreement, you and the Company agree that any legal dispute or controversy covered by this Agreement, or arising out of, relating to, or concerning the validity, enforceability or breach of this Agreement, shall be resolved by final and binding arbitration in accordance with the Employment Arbitration Rules of the American Arbitration Association ("AAA Rules") then in effect, and not by court or jury trial, to be held (unless the parties agree in writing otherwise) within 45 miles of and in the same state where you are or were last employed by the Company.**

The AAA Rules may be found at www.adr.org or by searching for "AAA Employment Arbitration Rules" using a service such as www.Google.com or by asking the Company's Human Resources Department for a copy of the rules.  The parties will first attempt to mutually agree upon an arbitrator.  If they cannot do so, the Company will contact AAA seeking an arbitrator appointment.  If for any reason the AAA will not administer the arbitration, either party may apply to a court of competent jurisdiction with authority over the location where the arbitration will be conducted by appointment of a neutral Arbitrator.  Any client to which you are assigned is an intended third party beneficiary of this Agreement and may directly enforce it.

Except as it otherwise provides, this Agreement also applies, without limitation, to disputes with any entity related to the application for employment, background checks, privacy, the employment relationship or the termination of that relationship, contracts, trade secrets, unfair competition, compensation, classification, minimum wage, seating, expense reimbursement, overtime, breaks and rest periods, termination, retaliation, discrimination or harassment and claims arising under the Fair Credit Reporting Act, Defend Trade Secrets Act, Title VII of the Civil Rights Act of 1964, 42 U.S.C. §1981, Rehabilitation Act, Civil Rights Acts of 1866 and 1871, the Civil Rights Act of 1991, the Pregnancy Discrimination Act, Equal Pay Act, Americans With Disabilities Act, Age Discrimination in Employment Act, Family Medical Leave Act, Fair Labor Standards Act, Employee Retirement Income Security Act (except for claims for employee benefits under any benefit plan sponsored by the Company and (a) covered by the Employee Retirement Income Security Act of 1974 or (b) funded by insurance), Affordable Care Act, Genetic Information Non-Discrimination Act, Uniformed Services Employment and Reemployment Rights Act, Worker Adjustment and Retraining Notification Act, Older Workers Benefits Protection Act of 1990, Occupational Safety and Health Act, Consolidated Omnibus Budget Reconciliation Act of 1985, other federal, state or local statutes or regulations addressing the same or similar subject matters, and all other federal, state or local legal claims arising out of or relating to your employment or the termination of employment (including without limitation torts and post-employment defamation or retaliation).

All claims in arbitration are subject to the same statutes of limitation that would apply in court. You and the Company shall follow the AAA Rules applicable to initial filing fees, but in no event will you be responsible for any portion of those fees in excess of the filing or initial appearance fees applicable to court actions in the jurisdiction where the arbitration will be conducted. The Company otherwise shall pay all costs and expenses unique to arbitration, including without limitation the arbitrator's fees. Discovery will be conducted in accordance with

Skaria 0000Appx. 92

the AAA Rules. The arbitrator must follow applicable law and may award only those remedies that would have applied had the matter been heard in court. The arbitrator's decision must be in writing and contain findings of fact and conclusions of law. Judgment may be entered on the arbitrator's decision in any court having jurisdiction.

This Agreement does not apply to litigation pending in a state or federal court as of the date of your receipt of this Agreement. This Agreement also does not apply to claims for workers' compensation, state disability insurance or unemployment insurance benefits. Nothing contained in this Agreement shall be construed to prevent or excuse you (individually or in concert with others) or the Company from utilizing the Company's existing internal procedures for resolution of complaints, and this Agreement is not intended to be a substitute for the utilization of such procedures. A party may apply to a court of competent jurisdiction for temporary or preliminary injunctive relief in connection with an arbitrable controversy, but only upon the ground that the award to which that party may be entitled may be rendered ineffectual without such relief (irreparable harm).

This Agreement does not prevent you from filing unfair labor practice charges with the National Labor Relations Board (www.nlrb.gov). The Company will not retaliate against you for filing such a charge. Nothing in this Agreement prevents you from making a report to or filing a claim or charge with a government agency, including without limitation the Equal Employment Opportunity Commission, U.S. Department of Labor, U.S. Securities and Exchange Commission, National Labor Relations Board, or Office of Federal Contract Compliance Programs. Nothing in this Agreement prevents the investigation by a government agency of any report, claim or charge otherwise covered by this Agreement. This Agreement also does not prevent federal administrative agencies from adjudicating claims and awarding remedies based on those claims, even if the claims would otherwise be covered by this Agreement. Nothing in this Agreement prevents or excuses a party from satisfying any conditions precedent and/or exhausting administrative remedies under applicable law before bringing a claim in arbitration. The Company will not retaliate against you for filing a claim with an administrative agency or for exercising rights (individually or in concert with others) under Section 7 of the National Labor Relations Act.

Disputes between the parties that may not be subject to predispute arbitration agreement as provided by the Dodd-Frank Wall Street Reform and Consumer Protection Act (Public Law 111-203) or as provided by an Act of Congress or lawful, enforceable Executive Order, are excluded from the coverage of this Agreement. Subject to a judicial determination concerning the enforceability of Executive Order 13673, Fair Pay and Safe Workplaces, this Agreement does not require arbitration of disputes addressed by that Executive Order arising under Title VII of the Civil Rights Act of 1964 or any tort related to or arising out of sexual assault or harassment. Likewise, as long as Section 8116 of the Department of Defense Appropriations Act of 2010 (Pub. L. 111-118) or its successor statutes remains in effect, this Agreement does not require arbitration of claims under Title VII of the Civil Rights Act of 1964, or any tort related to, or arising out of, sexual assault, harassment, including battery, intentional infliction of emotional distress, false imprisonment, or negligent hiring, supervision, or retention.

**B.      Class and Collective Action Waiver.** Private attorney general representative actions under the California Labor Code are not arbitrable, not within the scope of this Agreement and may be maintained in a court of law. However, this Agreement affects your ability to participate in class or collective actions. Both the Company and you agree to bring any dispute in arbitration on an individual basis only, and not on a class or collective basis on behalf of others. There will be no right or authority for any dispute to be brought, heard or

Skaria 0000Appx. 93

arbitrated as a class or collective action, or as a member in any such class or collective proceeding ("Class Action Waiver"). Notwithstanding any other provision of this Agreement or the AAA Rules, disputes in court or arbitration regarding the validity, enforceability or breach of the Class Action Waiver may be resolved only by the court and not by an arbitrator. In any case in which (1) the dispute is filed as a class or collective action and (2) there is a final judicial determination that all or part of the Class Action Waiver is unenforceable, the class and/or collective action to that extent must be litigated in a civil court of competent jurisdiction, but the portion of the Class Action Waiver that is enforceable shall be enforced in arbitration. You will not be retaliated against, disciplined or threatened with discipline as a result of your filing of or participation in a class or collective action in any forum. However, the Company may lawfully seek enforcement of this Agreement and the Class Action Waiver under the Federal Arbitration Act and seek dismissal of such class or collective actions or claims. The Class Action Waiver shall be severable in any case in which the dispute is filed as an individual action and severance is necessary to ensure that the individual action proceeds in arbitration.

**C.** **Your Right to Opt Out of Arbitration.** **Arbitration is not a mandatory condition of your employment at the Company, and therefore you may submit a statement notifying the Company that you wish to opt out and not be subject to this Agreement.** In order to opt out, you must notify the Company of your intention to opt out by submitting a signed and dated written statement to the Company's Human Resources Department stating that you are opting out of this Agreement. In order to be effective, your opt out notice must be provided within 30 days of your receipt of this Agreement. If you opt out as provided in this paragraph, you will not be subject to any adverse employment action as a consequence of that decision and may pursue available legal remedies without regard to this Agreement. If you do not opt out within 30 days of your receipt of this Agreement, continuing your employment constitutes mutual acceptance of the terms of this Agreement by you and the Company. You have the right to consult with counsel of your choice concerning this Agreement.

**D.** **Enforcement of this Agreement.** This Agreement replaces all prior agreements regarding the arbitration of disputes and is the full and complete agreement relating to the formal resolution of disputes covered by this Agreement. In the event any portion of this Agreement is deemed unenforceable, the remainder of this Agreement will be enforceable.

**E.** **Third Party Beneficiary.** Client and any staffing company through which Company provides services to Client are intended third party beneficiaries of this arbitration agreement and may directly enforce it.

I HAVE READ THIS WORKER ACKNOWLEDGMENT AND CONFIDENTIALITY AGREEMENT CAREFULLY, AND I UNDERSTAND AND VOLUNTARILY ACCEPT ITS TERMS.

WORKER

Name: _____Colin Skaria_____

Signature: _____

Date: 11/01/2018 _____

Skaria 0000Appx. 94

# Appendix Exhibit A-8

 Gmail                                 **colin skaria <colinskaria@gmail.com>**

## Updated Master Services Agreement-Abbott Labs
1 message

**Lex Gaumer** <lexg@fortitudesys.com>                      Tue, Nov 20, 2018 at 11:23 AM
To: "colinskaria@gmail.com" <colinskaria@gmail.com>

Hi Colin,


Attached is the updated Master Services contract. The date has been changed to reflect your new start date of 11/26/18.
Please let me know if you have any questions or concerns.


I also checked in with my back office and we are missing the following forms:

-w9

-certificate of insurance

-Void Check and direct deposit form

-Emergency Contact


They are attached here as well.


Let me know if you have any questions or concerns.


Best,


Lex




Lex Gaumer

Associate Operations Manager, Fortitude Systems

☏469-249-0700

🌐www.fortitudesys.com


IMPORTANT: The contents of this email and any attachments are confidential. They are intended for the named recipient(s) only. If you have received this email by mistake, please notify the sender immediately and do not disclose the contents to anyone or make copies thereof.

Skaria 0007   Appx. 96

**4 attachments**

**Updated Master Services Agreement-Colin Skaria.pdf**
244K

**Emergency Contact Info.pdf**
220K

**Form W-9 2017.pdf**
128K

**ADP Direct Deposit SIGN UP Form.pdf**
438K

Skaria 000186

Appx. 97